The **TRUSTEES OF INDIANA UNIVERSITY, Plaintiff–Appellant,**

v.

The **AETNA CASUALTY & SURETY COMPANY, Defendant–Appellee.**

No. 89–2914.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 22, 1990.
Decided Dec. 11, 1990.

Brent D. Taylor, Terrill D. Albright, David K. Herzog, Baker & Daniels, Indianapolis, Ind., for plaintiff-appellant.

**430**

Julia M. Blackwell, Hugh E. Reynolds, Jr., Richard A. Huser, Locke, Reynolds, Boyd & Weisell, Robert A. Kelso, New Albany, Ind., for defendant-appellee.

Before BAUER, Chief Judge, CUMMINGS, Circuit Judge, and PELL, Senior Circuit Judge.

BAUER, Chief Judge.

Before us is the appeal of the Trustees of the Indiana University ("I.U.") from a jury verdict and judgment in a diversity suit for breach of contract. I.U. sued The Aetna Casualty & Surety Company ("Aetna") over the deterioration of exterior facing bricks in four buildings at I.U.'s Southeast Regional Campus. Aetna was the surety for Mid Republic Construction Company ("Mid Republic"), the contractor that began the construction of the buildings in question. Aetna also became the assignee of Mid Republic's contract and completed performance of the contracts through another construction company.

I.U. charges error in the district court's denial of its motion for partial summary judgment as to Aetna's warranty liability. I.U. also charges error in several of the court's jury instructions. We affirm the district court in all respects.

I

In March, 1971, and April, 1972, I.U. contracted with Mid Republic for the construction of four buildings for I.U.'s Southeast Regional Campus in New Albany, Indiana. (The 1971 contract encompassed three of the buildings, and the 1972 contract the fourth.) Years earlier, I.U. had entered into a relationship with the firm of Applegate, Oakes, Ritz, Eby, Walker, Galbreath & Leach ("Walker Applegate") to provide architectural, engineering and landscaping services regarding the regional campus construction. Walker Applegate worked with I.U.'s in-house staff architects in the preparation and review of construction contracts and bids. As we shall see, Walker Applegate and I.U. also hashed-out between them the specifications for construction methods and materials, and selected some of these materials.

The 1971 and 1972 construction contracts between I.U. and Mid Republic contained essentially the same terms. Three provisions are important for our purposes here. First, ¶ 4.5 of the contracts' "General Conditions" (a standardized form developed by the American Institute of Architects) is headed "Warranty," and ¶ 4.5.1 states as follows:

The Contractor warrants to the Owner and the Architect that all materials and equipment furnished under this Contract will be new unless otherwise specified, and that all Work [1] will be of good quality, free from faults and defects and in conformance with the Contract Documents. All Work not so conforming to these standards may be considered defective. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of the materials and equipment.

Second, "Division 4" of the lengthy contract specifications contains instructions to Mid Republic concerning the masonry work on the buildings. Paragraph 3.1 of the masonry specifications lists four types of brick by manufacturer, tradename and size (e.g., "Adams Clay Products 'Dark Eyes' standard size ..."). Paragraph 10 instructs Mid Republic to build sample panels using these bricks, from which I.U. would choose the brick Mid Republic would be required to use on the four buildings. The four brick types listed in the masonry specifications were selected as follows: I.U. gave Walker Applegate a general list of Indiana brick manufacturers, Walker Applegate narrowed it down and presented several samples to I.U.'s in-house architects, who in turn chose the four brick types listed in the specifications.

---

1. "Work" is defined in ¶ 1.1.3 of the General Conditions to include "all labor necessary to produce the construction required by the Contract Documents, and all materials and equipment incorporated or to be incorporated in such construction."

Third, the contracts contain a section of provisions entitled "Supplementary General Conditions," which are modifications to the standard-form "General Conditions." Paragraph 15.20 of these provisions substitutes a new ¶ 9.7 regarding substantial completion and final payment. The new ¶ 9.7 provides that, upon receipt from the contractor of an application for final payment, the owner and architect will make a final inspection, ¶ 9.7.2, after which the parties will execute a "final certificate," which "shall constitute the acceptance of the work by the Owner, except as to work thereafter found to be defective. The date of such certificate shall be regarded as the date of acceptance of the work...." ¶ 9.7.5.

In 1971, Mid Republic began the construction of the buildings. As instructed, Mid Republic "laid up" sample panels of each of the four types of brick listed in ¶ 3.1 of the masonry specifications. Representatives of I.U. and Walker Applegate viewed the panels, and didn't like any of them. After consulting with the brick supplier as to their options, I.U. and Walker Applegate ordered a fifth panel of "courthouse blend" bricks to be laid up. (Courthouse blend appears to be either a mixture of two of the types of Adams Clay brick named in the masonry specifications, or a separate kind of Adams Clay brick.) Happy with the courthouse blend, I.U. and Walker Applegate instructed Mid Republic to use it on the facings of the buildings.

Mid Republic put up the exterior brick walls of the first building from July to November, 1971. The brickwork on the second two buildings was completed by May, 1972, and on the fourth by early April, 1973. Throughout, Mid Republic used the bricks and other facing materials specified by I.U. and Walker Applegate.

The first signs of trouble with the brickwork appeared even before the completion of the facing on the fourth building. As early as November, 1972, some of the bricks on the first three buildings started to display "efflorescence." This malady occurs when salts in the brick, mortar or some other material bleeds from the brick, leaving white deposits. Although some (but not all) of I.U.'s architects testified that efflorescence is "normal," the efflorescence on these buildings was clearly a matter of some concern to all parties at the time. The condition was discussed at several progress meetings in late 1972 and early 1973, after which it was decided that cleaning and waterproofing of the bricks would be postponed until fall of 1973 to allow the bricks to dry.

No sooner had the brickwork on the fourth building been completed when a second, more serious problem cropped up. In May, 1973, I.U. officials began discovering cracks in some of the exterior walls. Walker Applegate and Mid Republic looked into the problem, and it was determined that the cracks were the result of Walker Applegate's failure to require the use of control joints to accommodate for the natural expansion and contraction of the masonry walls. A lengthy dispute ensued over who was to blame for the cracks and who was to pay for the repair of the affected walls. A settlement ultimately was reached between Aetna and Walker Applegate in 1976, and the walls were repaired. This specific cracking problem was not the issue that resulted in the instant lawsuit.

What did give rise to the instant suit was a third set of problems with the brickwork. Beginning in late 1973, I.U. personnel noticed that the facing bricks had begun to "spall" (chip or flake) and deteriorate. Concerned about these developments, I.U.'s in-house architects made inquiry with the brick manufacturer. The brick manufacturer inspected the buildings and represented to all parties that it found no spalled bricks and that all of the bricks were "structurally sound." Evidence of major problems with the bricks kept coming in, however. I.U. had contracted with another construction company, Glenroy, to build two additional buildings at the regional campus using the same Adams Clay brick. Glenroy, too, noticed the efflorescence, spalling and other problems with the bricks on Mid Republic's buildings, and therefore decided to have samples of the brick tested before it used the same bricks on its buildings. In September, 1973, Walker Apple-

gate and I.U.'s in-house architects (but not Mid Republic or Aetna) received the test results, which showed that the bricks did not meet quality standards with respect to initial rate of absorption, that the brick was excessively porous, and that the possibility of spalling in winter months was very great. (Nonetheless, because Walker Applegate did not show any great concern about these results, I.U. instructed Glenroy to use the same facing brick as had Mid Republic.) As one further sign of impending trouble, the spalling on some of Mid Republic's buildings was already bad enough by the spring of 1975 that I.U. ordered repair work at that time.

Despite the onset of these brick-related problems, I.U. deemed Mid Republic's buildings to be "substantially complete" in April, 1973. Later that year, I.U. learned that Mid Republic, due to financial difficulties, would be unable to complete the buildings. With I.U.'s consent, Mid Republic assigned all of its rights and obligations under the contracts to Aetna, which in turn contracted with another construction company, Geupal DeMars, to complete the buildings. In June, 1975, Aetna submitted documents stating that all work was complete, and requested final payment. Walker Applegate certified that the four buildings were complete and final payment could be made, and, in September, 1975, I.U. executed the certificate for final payment.

The spalling and deterioration, particularly of several freestanding "garden walls," soon got much worse.[2] (Proving that "when it rains, it pours," a design problem unrelated to the brick deterioration also forced I.U. to undertake the emergency replacement of a brick wall on one of Mid Republic's buildings in 1981.) Fearing that it would be left with the bill for massive replacement work, I.U. filed this diversity breach of contract action against Aetna in August, 1982. Aetna responded with an answer and a third-party complaint against Walker Applegate. The district court bifurcated the Aetna–Walker Applegate third-party action for separate adjudication. In the principal action, Aetna and I.U. filed cross motions for summary judgment. Aetna wanted the entire action dismissed.[3] I.U. wanted the court to rule as a matter of law that the ¶ 4.5.1 warranty was breached by the use of bricks with a latent defect. In an order dated July 19, 1988, the court denied both motions, and the case proceeded to trial before a jury.

As in most construction-related litigation, the evidence in this case featured a battle between two retained experts: in I.U.'s corner, Robert Crooks; in Aetna's corner, Gerard D'Huy. Crooks and D'Huy differed markedly in their assessments as to both the cause(s) of the brick deterioration and the extent of the remaining problem.[4] Crooks testified, based on his laboratory tests using the "Maage method," that the bricks were underfired during the manufacturing process, which was the primary cause of the spalling and deterioration (certain design and "workmanship" problems accelerated the deterioration, particularly on the garden walls). D'Huy countered by disputing the value of the Maage method; he preferred to focus on "durability in service." D'Huy testified that, from his analysis, the deterioration was caused more by design and maintenance problems, and by the fact that the bricks were not suited for the "severe" weather they encountered,

---

**2.** We note that the deterioration problem appeared on the brickwork on two of Glenroy's buildings even more rapidly than Mid Republic's buildings.

**3.** One of the arguments Aetna advanced in its motion for summary judgment involved its reading of ¶ 15.26.1 of the Supplementary General Conditions. That provision creates a duty for the contractor to correct defects brought to its notice within two years. Aetna argued, and re-argues here, that ¶ 15.26.1 should be read as a statute of limitations. The district court rejected this argument, finding that the unambiguous language of ¶ 15.26.1 "does not serve to limit the time in which actions for breach of express warranty may be brought, but rather provides an additional remedy." (citing, *inter alia, Board of Regents v. Wilson*, 27 Ill.App.3d 26, 326 N.E.2d 216 (1975)). Aetna's attempt to resurrect this argument in this court is unpersuasive.

**4.** Extensive brick replacement work was undertaken on two of Mid Republic's buildings in 1985–1986.

than by any manufacturing defect. As to the extent of the remaining problem, Crooks testified that virtually all of the original bricks that remain in the walls of Mid Republic's four buildings must be replaced at an estimated cost of $2.3 million. In contrast, D'Huy testified that the replacement work done in 1985–1986 took care of most of the problem, leaving a small segment of spalled brickwork that must be replaced at an estimated cost of $73,780.

After taking under advisement Aetna's two motions for directed verdict and denying a similar motion by I.U., the court gave the case to the jury, which returned a verdict in favor of Aetna. The court entered judgment on the jury's verdict on June 28, 1989. The court thereafter denied all of I.U.'s post-verdict motions, and, on September 25, 1989, entered an order certifying, *nunc pro tunc*, that the court's June 28 judgment order was final and appealable and there was no just reason for delay. *See* Fed.R.Civ.P. 54(b). From this final judgment I.U. brings this appeal.

## II

■ I.U.'s primary argument centers on what it sees as a legally untenable inconsistency in the district court's rulings. The court stated in its order denying summary judgment that "[i]t is undisputed that the spalling was the result of underfiring during the manufacturing process." Yet, in the same order, the court refused to rule as a matter of law that the ¶ 4.5.1 warranty was breached as a result of the use of bricks with this manufacturing defect. What's more, I.U. argues, the court compounded this error by instructing the jury that it could find for Aetna if I.U. required

Mid Republic to use an "unsuitable" (versus "defective") brick [5].

■ Before addressing the merits of I.U.'s position, we pause briefly to address a procedural foreclosure argument raised by Aetna. Aetna claims that I.U. cannot here charge error in the district court's summary judgment ruling because that ruling was made "moot" and "irrelevant" by the fact that the case subsequently was tried to a jury. Aetna's argument misunderstands the law in this circuit concerning which (and how) issues may be litigated on appeal. I.U.'s notice of appeal properly names a final judgment: the district court's June, 1989 judgment order (and the subsequent *nunc pro tunc* certification). But the appeal is not strictly limited to the holdings listed in the final judgment document; it also "brings up for review all decisions that shaped the contours of that judgment." *Kamen v. Kemper Fin. Servs.*, 908 F.2d 1338, 1341 (7th Cir.1990) (citing cases). Thus, the district court's refusal to rule on the applicability of the ¶ 4.5.1 warranty as a matter of law, because it substantially affected the issues that were tried and upon which judgment was entered, was an interlocutory decision that can be challenged in this appeal from the final judgment. *See In the Matter of Xonics, Inc.*, 813 F.2d 127, 130–31 (7th Cir.1987) ("Adverse decisions on interlocutory matters may be saved up to be appealed at the end of the case."). To put it more succinctly, "[a]s with other interlocutory orders that arise during the course of a case, denials of summary judgment are merged into a final judgment and then may be appealed." *E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 353 n. 55 (7th Cir.1988) (citing, *inter alia*, C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2715, pp. 636–38 (2d ed. 1983)).[6]

---

5. We note that nowhere in its challenges to several of the district court's jury instructions does I.U. establish that it preserved these issues by objecting to the instructions when they were proposed or by proffering an alternate version. *See Sims v. Mulcahy*, 902 F.2d 524, 535–36 (7th Cir.1990). We are saved from the task of searching the record ourselves for evidence of timely objection, however, by Aetna's failure to raise waiver as a defense; as we've stated before, "A defense of waiver is itself waivable."

*McKnight v. General Motors Corp.*, 908 F.2d 104, 108 (7th Cir.1990).

6. *Holley v. Northrop Worldwide Aircraft Serv.*, 835 F.2d 1375 (11th Cir.1988), is not to the contrary. In *Holley*, the court refused to allow Northrop to appeal the district court's denial of summary judgment because "Northrop concede[d] that by trial the evidence was sufficient to be placed before the jury." *Id.* at 1377–78. I.U. has made no such concession.

That said, I.U.'s position is easily rejected on the merits. First, in attacking the summary judgment denial, I.U. substantially mischaracterizes both the predicate and the grounds for the court's ruling. At the time it ruled, the district court had before it a motion from I.U. that argued that, as a matter of law, the ¶ 4.5.1 warranty was breached by Mid Republic when it used bricks with a latent defect. On appeal, I.U. suggests that what it really requested was a limited ruling as to the "applicability" of the ¶ 4.5.1 warranty, leaving for the jury the question of waiver of (and therefore of Aetna's ultimate liability under) the warranty. This mischaracterization of the record is compounded by I.U.'s misstatement of the grounds for the court's denial of its motion. I.U. argues here that the court denied its motion "because it concluded that there was a fact issue as to whether the contractor, Mid Republic, was obligated under the contracts to determine whether the bricks met certain laboratory standards." Appellant's Brief, p. 15. In fact, the language of the order clearly states that I.U.'s motion for summary judgment on warranty liability was denied because "I.U.'s knowledge of the alleged defect remains to be a question of fact.... The existence of such a question of fact precludes the granting of summary judgment in either Aetna's or I.U.'s favor on this ground." Memorandum Entry of July 19, 1988 ("SJ Mem."), p. 10. (The factual issue as to Mid Republic's duty to test the bricks is given by the court as one ground for denying *Aetna's* summary judgment motion.)

These mischaracterizations are telling. Only by re-writing both its summary judgment motion and the court's ruling thereon can I.U. avoid the simple truth of the matter: the district court refused to grant summary judgment on warranty liability because disputed factual issues existed

that would affect I.U.'s right to claim the protection of the warranty. As the district court aptly noted, the fate of I.U.'s warranty claim and Aetna's waiver defense depended upon conflicting evidence and inferences therefrom, which "are only properly drawn by a trier of fact." SJ Mem. at 10. Reviewing the district court's determination *de novo, E.E.O.C. v. Sears*, 839 F.2d at 354, we agree that genuine issues of material fact remained such that I.U.'s motion for summary judgment on warranty liability was properly denied. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Indeed, even I.U. does not here challenge the district court's refusal to decide the waiver issue at the summary judgment stage, though it fails to deal forthrightly with the import of that ruling.

Beyond these unfortunate obfuscatory tactics, I.U.'s argument fails on a second level. At the center of I.U.'s argument lies the supposition that the district court "confused suitability with defect." What I.U. calls "confusion," however, was merely the court's—and the jury's—ultimate refusal to accept I.U.'s version of the evidence. I.U. claims (and claimed) that the bricks spalled because they were "suitable yet defective," meaning that they were a bad batch of underfired bricks that otherwise would have performed fine. The evidence actually adduced at trial, however, conflicted as to the cause of the spalling and deterioration. Through Crooks, I.U. presented evidence that the bricks were defective. In contrast, D'Huy testified concerning design and maintenance flaws, and concluded that the bricks were not durable because they were not suited to the environmental conditions in which they were used. After hearing this evidence, the jury was instructed as to both I.U.'s defect theory [7] and Aet-

---

**7.** Instruction No. 13 explained the concept of express warranty and reproduced the ¶ 4.5.1 warranty. Instruction No. 14 then stated,

> I.U. claims that Mid Republic and its successor, Aetna, breached the warranty by using bricks which deteriorated prematurely because they were defective, and by providing

faulty workmanship during the construction of [the buildings].

A breach of an express warranty is a breach of contract. If you find that some of the bricks were not of good quality or contained a fault or defect, and such condition of the brick proximately caused damages to I.U., you should find in favor of I.U. on its claim of

na's unsuitability theory.[8] Thus, the court properly gave to the jury the task of sorting the wheat from the chaff. The fact that the jury apparently put I.U.'s claims in the latter category was not the result of any legally erroneous "confusion" on the part of the district court.

■■■ In the face of all this, I.U. pins its hopes on the sentence in the district court's summary judgment order wherein the court stated that it was "undisputed" that the spalling was caused by a manufacturing defect (underfiring). I.U. argues that the court was bound by this "finding" throughout the subsequent proceedings because it was the "law of the case," and thus the court committed error by letting the jury decide the issues of causation and warranty liability. The law of the case doctrine is wholly inapplicable here. Putting aside the use of "law of the case" as a short-hand reference for statutory directives (such as 28 U.S.C. § 1738; *see, e.g., PaineWebber Inc. v. Farnam,* 870 F.2d 1286 (7th Cir.1989)), the doctrine "merely expresse[s] the practice of courts generally to refuse to reopen what has been decided, not a limit on their power." *Cameo Convalescent Center, Inc. v. Percy,* 800 F.2d 108, 110 (7th Cir.1986). As this phrase suggests, the doctrine most often applies to issues already fully decided in cases that subsequently re-appear before the rendering court. For example, in *Cange v. Stotler & Co.,* 913 F.2d 1204 (7th Cir.1990), we held on first appeal that summary judgment should not have been granted rejecting an estoppel defense to a statute of limitations, and remanded for trial. In a subsequent, post-trial appeal, that holding acted as law of the case concerning the sufficiency of the evidence to support a favorable estoppel finding at trial, because "there were [no] material differences between the set of facts presented on the motion for summary judgment, and the facts proved at trial." *Id.* at 1208. *See also Hartford Accident and Indemnity Co. v. Gulf Insurance Co.,* 837 F.2d 767, 774 (7th Cir.1988).

We could find no case (and I.U. does not venture to cite one) in which the law of the case doctrine has been applied to bind a district court to a factual statement made by the court in the course of denying a summary judgment motion, when subsequent proceedings following directly on that denial bring the factual statement into doubt. And for good reason: so long as the factual issue has not been brought to judgment, the parties should be free in the course of the same proceeding to offer evidence on the issue. That is what happened here; and we find no error in that fact. *Cf. Holley v. Northrop Worldwide Aircraft Serv.,* 835 F.2d 1375, 1378 (11th Cir.1988) ("A party may not rely on the undeveloped state of the facts at the time he moves for summary judgment to undermine a fully developed set of trial facts which militate against his case.")

■■■ Which brings us to a third issue: what about Instructions No. 15 and 17 (reproduced in the margin), by which the jury learned of the law that would obtain if it found that I.U. picked unsuitable brick?[9]

---

breach of express warranty, unless you also find for Aetna on one of its affirmative defenses to that claim. Similarly, if you find that some of the labor or workmanship was not of good quality or contained a fault or defect, and that such labor or workmanship proximately caused damages to I.U., you should find in favor of I.U. on its claim of breach of express warranty, unless you also find for Aetna on one of its affirmative defenses to that claim.

8. In Instructions No. 15 and 17, reproduced *infra* at note 9, the court informed the jury as to the law concerning Aetna's cross-warranty argument. These instructions refer to the "suitability" of the bricks for their intended use.

9. Instruction No. 15 stated, in pertinent part,

As one of its a [sic] affirmative defenses, Aetna claims that it cannot be held responsible for damages resulting from brick which the construction contracts required Aetna to use and in the selection of which Aetna had no responsibility or connection whatsoever.

You are instructed that in a construction contract the owner warrants to the contractor that if the contractor follows the owner's plans and specifications, then the owner impliedly warrants that the resulting structure and its component parts will be suitable for the particular purpose for which they are intended. Both parties agree that under the contract in this case, neither Mid Republic nor Aetna could unilaterally change the contract specifications. You are further instruct-

That it was bound to follow I.U.'s and Walker Applegate's masonry specifications was Aetna's primary defense. In warranty parlance, Aetna argued that, by specifying the brick to be used by manufacturer and trade name, I.U. impliedly warranted that the brick was suitable; and it turned out the brick was not. This argument invokes the line of cases anchored by *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918), wherein the Supreme Court held that "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *Id.* at 136, 39 S.Ct. at 61. In *Spearin*, the government supplied the contractor with detailed plans and specifications for the construction of a sewer and dry-dock, and the Court stated that "the insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that, if the specifications were complied with, the sewer would be adequate." *Id.* at 137, 39 S.Ct. at 61. *Spearin*'s teaching concerning the effect of detailed specifications has been extended to situations in which the "defect" in the specifications was the naming of materials that themselves had a latent defect—including bad bricks. *See Wood–Hopkins Contracting Co. v. Masonry Contractors, Inc.*, 235 So.2d 548 (Fla.App. 1970). Also, Indiana, whose law applies in this diversity suit, has long accepted the notion that detailed specifications imply a warranty. *See, e.g., Allied Structural Steel Co. v. Indiana*, 148 Ind.App. 283, 265

N.E.2d 49, 55–56 (1970); *Rayl v. General Motors Corp.*, 121 Ind.App. 608, 101 N.E.2d 433, 435 (1951). This court considered the effect of specifications on a warranty in *Fidelity & Deposit Co. of Maryland v. Sheboygan Falls*, 713 F.2d 1261 (7th Cir.1983). In that diversity action involving Wisconsin law, we noted that "where the buyer directs the contractor to perform the contract in a particular way and the contractor does so but disaster ensues because the directions given were wrong, normally the contractor is not liable." *Id.* at 1269.[10]

I.U. has hotly disputed Aetna's invocation of *Spearin* and the implied warranty argument. I.U.'s counter-arguments have included: 1) the *Spearin* doctrine is inapplicable because I.U. selected the bricks solely on the basis of color, texture and appearance, not suitability (besides, I.U. adds tirelessly, the problem with the bricks was not that they were unsuitable, but defective); 2) the express warranty contained in ¶ 4.5.1 cannot be trumped by a warranty implied from I.U.'s selection of the brick (this despite cases such as *Charles R. Perry Constr., Inc. v. C. Barry Gibson & Assoc., Inc.*, 523 So.2d 1221, 1222–23 (Fla.App. 1988), wherein an express contractual warranty similar to ¶ 4.5.1 was so "trumped"); and 3) various arguments distinguishing *Spearin*-doctrine cases, as well as an extended argument concerning "the economically efficient result." To all of which, of course, Aetna has offered "counter-counter-arguments."

---

ed that the owner cannot hold the contractor liable for breach of warranty if the damages sustained by the owner are caused because the product expressly selected solely by the owner or its representative for use on the building was not suitable for such use.

Therefore, if you find that Mid Republic and Aetna used the brick which the contract specifications required and that Mid Republic was not responsible in any manner for the selection of the brick in this case, then you should return a verdict for Aetna on I.U.'s breach of warranty for defective brick claim. Instruction No. 17 stated, in pertinent part,

If an owner specifies in a construction contract that a particular brick is to be used, then the contractor is released from any promise

or warranty as to the suitability of such brick for use as intended in the contract.

**10.** As I.U. notes, we also stated in *Fidelity* that the contractor involved there could be held liable for the failure of a piece of equipment specified by the owner in the contract. *Id.* at 1269–72. In that case, however, the contract contained "repeated intimations [in the form of guarantees of specific levels of performance] that the contractor is to guarantee that the equipment that the contract specifies will do the job, even though he had no say—no direct say, anyway—in the choice of equipment." *Id.* at 1271–72. Evidence of similar performance guarantees is absent in the instant case.

We need not descend further into the minutiae of this debate, however. At issue are two jury instructions; our review of jury instructions is limited to the determination of "whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues.... With instructions, we don't pick nits; we examine the whole of what was given and look for overall fairness and accuracy." *Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732, 741–42 n. 7 (7th Cir.1990) (quotations and citations omitted). Using this standard of review, we conclude that Instructions No. 15 and 17 find adequate support in the record and are fair, accurate summaries of law arguably applicable to this case. Thus, the district court did not commit reversible error in giving them to the jury.

█ I.U.'s only remaining argument that merits mention involves the district court's waiver instruction. As one of its affirmative defenses, Aetna has argued that I.U. waived the ¶ 4.5.1 warranty by making final payment in September of 1975 (and thus, by operation of ¶ 9.7.5 of the Supplementary General Conditions, accepting all work save after-discovered defects), even though it had substantial evidence at the time of the spalling and deterioration problem. In Instruction No. 16, the court presented this theory to the jury. I.U. alleges two errors regarding Instruction No. 16: the fact that it was given, and the inclusion of the following language:

In this case it is not necessary for Aetna to prove that I.U. knew that the brick, or any particular portion thereof, would fail in its intended use. The standard is whether I.U. knew, or reasonably should have known, that the condition and quality of the brick indicated that all or some portion of the brick would fail in its intended use. It is not necessary that I.U. be absolutely sure or know exactly why the brick would fail or would be likely to fail.

Therefore, if you find that I.U. knew, or reasonably should have known, that the brick and/or workmanship used in these construction projects was not free from defects or faulty workmanship, then you should conclude that I.U. waived its right to recover on I.U.'s brick and/or workmanship breach of warranty claims, and return a verdict for Aetna on these claims.

As to I.U.'s first allegation, Aetna adduced sufficient evidence at trial to warrant a waiver instruction. The documentary evidence and the testimony of I.U.'s own architects established that, by September, 1975, I.U. had information from several sources—including first-hand observation, the Glenroy tests and the repairs already ordered by I.U.—that the bricks were spalling and deteriorating. I.U. nonetheless executed the final certificate and made final payment. These facts, combined with the text of ¶ 9.7.5, justified a waiver instruction.

I.U.'s second charge of error regarding Instruction No. 16 is that the instruction includes an incorrect waiver standard. I.U. argues that Indiana's general standard for waiver in contract cases is the *Johnson v. Zerbst* standard, *to wit*, "an intentional relinquishment or abandonment of a known right or privilege." 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). In the paragraph immediately proceeding the passage quoted above, the district court did in fact recite this definition of waiver in Instruction No. 16. I.U. argues that the court contradicted this standard (as well as "settled Indiana law") by giving the above-quoted language that allowed the jury to find waiver if I.U. "knew or reasonably should have known" that the bricks were faulty. Not so. Even accepting the *Johnson* waiver standard as applicable, the challenged portion of Instruction No. 16 does not run afoul of it. The instruction did not allow the act of waiver to be imputed or inferred; it merely applied an objective standard to the question of I.U.'s knowledge of defects or problems with the bricks, a legal proposition that finds support both in Indiana contract law, *see* 6 Indiana Law Encyclopedia *Contracts* § 233 (West 1960) ("[A] party who ignores a breach of contract may be held to have waived it"), and in factually analogous

cases from other jurisdictions. *See, e.g., Shaw v. Bridges–Gallagher*, 174 Ill.App.3d 680, 124 Ill.Dec. 241, 246, 528 N.E.2d 1349, 1354 (1988) ("An absolute and unconditional acceptance of the work can act as a waiver or acceptance of defective performance. In order for there to be a waiver, however, the facts must indicate that the injured party intentionally relinquished a known right, and the injured party cannot relinquish that right unless he or she knows or has reason to know of the defective condition.") (citations omitted); *Cantrell v. Woodhill Enterprises, Inc.*, 273 N.C. 490, 160 S.E.2d 476, 481 (1968) (waiver of defective performance can be found where work is accepted and "knowledge of its imperfect performance can be imputed," but not where defects are "unknown and not discoverable by inspection"). Further, any misunderstanding that may have been caused by any apparent conflict between the challenged language and the recitation of the *Johnson* waiver standard is heavily tempered by the fact that the evidence adduced at trial more than adequately supports a finding that I.U. officials had actual, subjective knowledge of problems with the brickwork, including spalling and premature deterioration, at the time I.U. executed the final certificate.

Thus, reviewing the instruction " 'as a whole, in a common sense manner, avoiding fastidiousness, inquiring whether the correct message was conveyed to the jury reasonably well,' " *Certain Underwriters of Lloyd's v. General Accident Ins. Co. of America*, 909 F.2d 228, 234 (7th Cir.1990) (quoting *Wilk v. American Medical Ass'n*, 719 F.2d 207, 218 (7th Cir.1983)), we conclude that the wording of Instruction No. 16 does not constitute reversible error.

### III

Without doubt, something was wrong with a good portion of the brickwork done on the four buildings constructed by Aetna's principal and assignor. Maybe the bricks that I.U. selected for the buildings were manufactured improperly; maybe the design specifications for certain walls were faulty; or maybe the bricks were unsuited

for the locale. Whatever the cause, substantial and costly repairs have already been made, and more are apparently indicated. The jury found, despite I.U.'s fully-argued claim of warranty liability, that Aetna cannot be held accountable for these repairs. I.U. wants another chance, claiming that, had the district court "understood" its warranty claim, the warranty issues would never have gone to the jury, and/or the jury would have received different instructions. None of I.U.'s arguments establish reversible error by the district court, and we, therefore,

AFFIRM.