UNITED STATES of America,
Plaintiff–Appellee,

v.

Steven DONOVAN, Vincent C. Donovan, Patrick A. Shea, and Stephen J. Dineen, Defendants–Appellants.

Nos. 92–3583, 92–3624, 92–3625 and 92–3650.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 5, 1993.

Decided May 13, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied July 14, 1994.

910

Stephen A. Ingraham, Asst. U.S. Atty. (argued), Milwaukee, WI, for plaintiff-appellee.

Robert W. Bertucci, Serpico, Novelle & Navigato, Steven Shamash, Layfer, Cohen & Handelsman, Christopher M. Stone (argued), Chicago, IL, for defendant-appellant.

Before BAUER, CUDAHY, and RIPPLE, Circuit Judges.

BAUER, Circuit Judge.

On January 7, 1992, a grand jury indicted Vincent Donovan, Steven Donovan, Patrick Shea, and Stephen Dineen for conspiring to distribute cocaine. In addition, the indictment charged Vince Donovan with two counts of possession of cocaine with the intent to distribute and with two counts of travelling in interstate commerce to facilitate an illegal act, Steve Donovan with one count of possession of cocaine with the intent to distribute and with one count of travelling in interstate commerce to facilitate an illegal act, and Steve Dineen with one count of travelling in interstate commerce to facilitate an unlawful activity. All four were tried together, and a jury convicted all four on all counts of the indictment. Each defendant appeals his conviction on several grounds, and all but Steve Donovan appeals his sentence. We affirm.

## I. Facts

During the last half of the 1980s, Vince Donovan, an erstwhile automobile racer, orchestrated an extensive scheme to distribute cocaine in and around Milwaukee. Donovan's scheme took off in 1985 when he was introduced to a major Columbian drug supplier in Florida. At that time, he bought a few ounces of cocaine. In 1986, Vince brought his brother Steve with him to meet his Florida supplier. At that meeting, Vince Donovan's plan to sell cocaine accelerated as the three men discussed the possibility of conducting large cocaine transactions to facilitate the Donovans' drug trade in Milwaukee. Following this meeting, the Florida supplier flew to Milwaukee to evaluate Vince Donovan's operation in Milwaukee in order to confirm that it was an appropriate outlet for his cocaine. In Milwaukee, the Donovans explained to the Florida supplier that each had separate cocaine customers, but worked together in other aspects of the cocaine business. Apparently, the Donovans' operation satisfied the Florida supplier; he agreed to provide cocaine to the Donovan team.

In October 1986, Steve Donovan, accompanied by his girlfriend Wanda Young, flew to Florida and obtained one kilogram of cocaine from the Florida supplier. The two travelled to Florida again in December 1986 and January 1987, each time returning with a kilogram of cocaine provided by the Florida supplier. Vince Donovan was present for the January transaction, and phone records demonstrate that he placed several phone calls to Patrick Shea from Florida.

Later in January 1987, when Wanda Young decided she would retire from her drug courier activities because of her pregnant condition, Vince Donovan enlisted Steve Dineen to act as his courier. In January 1987, Vince Donovan took Dineen to Florida to meet the Florida supplier. Over the next several months, Dineen made at least five trips to Florida to obtain cocaine for the Donovan drug ring. For his efforts, Vince Donovan paid Dineen between $1,500 and $2,000 plus expenses.

As a result of his trips to Florida, Dineen was frequently absent from his place of employment. Dineen finally informed his employer, Rick Kizel, of the reason for his absences. Dineen told Kizel that the Donovan brothers and Shea pooled money to purchase cocaine from the Florida supplier and encouraged Kizel to invest with them.

Vince Donovan's drug scheme progressed like a well-oiled machine until it suffered a temporary breakdown: Dineen was arrested in Chicago's Union Station on September 22, 1987 for possession of one and one-half kilograms of cocaine obtained from the Florida supplier. Dineen called Vince Donovan who, together with Dineen's roommate, travelled to Chicago to help Dineen. There, Vince Donovan secured legal counsel for Dineen and provided Dineen $5,000 with which to pay his attorneys. The charges against Dineen were eventually dropped.

After his arrest, Dineen planned two more trips to Florida. In the spring of 1988, Dineen set out for Florida with money contributed by Vince Donovan, Kizel, Shea and others to purchase two kilograms of cocaine from the Florida supplier. Dineen was unable to complete the trip because his car broke down, forcing him to return to Milwaukee. In June 1988, Dineen made his last trip to Florida on behalf of the Donovan drug ring. On that trip, he purchased two kilo-

grams of cocaine from the Florida supplier with money from Vince Donovan.

About December 1987, Kizel decided he wanted to deal cocaine and entered the cocaine race. He began purchasing cocaine from Shea. In February 1988, Kizel and Shea jointly purchased one kilogram of cocaine from Shea's Chicago cocaine source. In March 1988, Vince Donovan put Kizel in contact with his Florida supplier. At that time, Kizel purchased a one-half kilogram of cocaine for himself and another kilogram for Vince Donovan from the Florida supplier. Upon returning to Milwaukee, Kizel could not contact Vince Donovan, and, believing Vince Donovan and Shea to be partners in the cocaine trade, delivered the kilogram of cocaine to Shea. While Vince Donovan chastised Kizel for delivering the cocaine to Shea, he never demanded any payment from Kizel or mentioned Kizel's "mistake" again. Through much of 1988, Kizel obtained cocaine from both Shea and the Florida supplier: approximately fifteen kilograms from Shea and three kilograms from the Florida supplier.

In December 1988, Kizel convened a meeting at Shea's gas station among Shea, Vince Donovan, and himself. The Florida supplier had told Kizel that he could make significant quantities of cocaine available if the Milwaukee group wanted to expand its operation. At that meeting, the three decided that they indeed wanted to take advantage of the Florida supplier's offer. They determined that they would need to rent a storage locker in which to store the cocaine. Shea offered to provide an old automobile to place in the shed so that the cocaine could be stored in its engine block. Kizel rented the storage locker, and Shea provided the car. The storage locker was never used for this purpose because Vince Donovan and Shea informed Kizel that they preferred to purchase the cocaine from Shea's Chicago source because it was less expensive than the cocaine from the Florida supplier.

In February 1989, Kizel obtained ten kilograms from the Florida supplier in three separate transactions. Kizel obtained three of the kilograms for Vince Donovan and provided 12 ounces of cocaine from these trans-

actions to Shea. In March 1989, Vince Donovan travelled to Florida himself to obtain two kilograms from his supplier there. Immediately after obtaining the cocaine, telephone records demonstrate that Vince Donovan called Kizel and Shea from his mobile phone.

In February 1989, Vince Donovan's cocaine ring ran into a snag; local law enforcement officials raided storage facilities rented by Kizel to store cocaine. The authorities found nothing because Kizel had moved his cocaine. This setback did not deter the Donovan team, and Vince Donovan met with the Florida supplier in Chicago in April 1989 to discuss a multiple kilogram deal. The proposed transaction was never consummated; Vince Donovan could not produce the cash necessary to purchase such a large amount of cocaine.

In October 1989, however, Wanda Young began providing the IRS with information regarding the cocaine trafficking of Shea, Steve Donovan, and Vince Donovan. Among other things, Young told authorities that Steve and Vince Donovan obtained much of their cocaine from Shea and that Steve Donovan was selling several ounces of cocaine a week.

From this point, the authorities continued in their efforts to put the Donovan team out of commission. The remainder of the sordid details of the Donovan cocaine ring do not merit recitation. Suffice it to say that the authorities' evidence includes: 1) drug paraphernalia, 2) additional aborted drug buys, 3) threats of harm made by Steve Donovan, Vince Donovan, and Steve Dineen against potential witnesses, and 4) failed "set-ups" of the defendants by the authorities. The investigation finally ended on January 7, 1992 with the six count indictment of the four defendants.

## II. Analysis

The defendants, in various combinations, challenge several aspects of their collective trial and individual sentences. We will address and dispose of these arguments in turn.

## A. Sufficiency of the Evidence

Dineen, Shea, and Vince Donovan argue that the government's evidence was insufficient to support their conspiracy convictions; they claim that no single conspiracy was proved and that they did not participate in the alleged conspiracy. We must review the evidence in a light most favorable to the government, drawing all reasonable inferences and ascertain whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Boykins*, 9 F.3d 1278, 1282 (7th Cir.1993) (quoting *United States v. Tanner*, 941 F.2d 574, 586 (7th Cir.1991)).

■ The federal reporters abound with opinions from this and other courts describing drug conspiracies in painstaking detail and evaluating evidence against convicted drug conspirators' sufficiency claims. From those cases, we can glean several principles that properly guide us in consideration of this case. As an initial matter, the government must prove membership in the conspiracy by "substantial evidence." *United States v. Goines*, 988 F.2d 750, 758 (7th Cir.1993). The government is not required, however, to prove the conspiracy by direct evidence; "circumstantial evidence may be used to demonstrate both a conspiracy and the defendant's participation in the conspiracy." *United States v. Gutierrez*, 978 F.2d 1463, 1468 (7th Cir.1992).

■ In evaluating the government's evidence, we expect jurors to draw on their experience as well as their common sense to draw reasonable inferences from the circumstantial evidence. *See United States v. Troop*, 890 F.2d 1393, 1397 (7th Cir.1989). Thus, "we will not reweigh the evidence or judge the credibility of witnesses; that is the jury's function." *Goines*, 988 F.2d at 758 (citations and quotation marks omitted). Only "extraordinary circumstances" will cause us to question the jury's credibility findings. *Troop*, 890 F.2d at 1397.

■ With respect to the facts the government must prove, certain characteristics of conspiracies are important. The crime of conspiracy focuses on agreements. *United*

*States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir.1990). The government must prove that the defendants knew of the agreement and intended to join it. *Id.* (citing *United States v. Cerro*, 775 F.2d 908, 911 (7th Cir.1985); *United States v. Bruun*, 809 F.2d 397, 410 (7th Cir.1987)). Further, we are aware that, in drug distribution conspiracies, the exact parameters of a specific agreement are sometimes difficult to ascertain. *United States v. Collins*, 966 F.2d 1214, 1221 (7th Cir.1992).

■ While Vince Donovan's collection of collaborators was hardly cohesive, the government's evidence presented a reasonably clear picture of the agreement among the co-conspirators. The "core" defendants, Steve Donovan, Vince Donovan, and Pat Shea, dealt cocaine; a steady stream of witnesses testified to that fact. Vince Donovan, through his acquaintance with the Florida cocaine supplier, established a pipeline of cocaine from Florida to Milwaukee. He made this supply of cocaine available to associates in the cocaine industry. The agreement among these core participants was that in order to facilitate their individual cocaine dealing, they would collaborate and obtain cocaine from this Florida supplier. Sometimes one would obtain cocaine from another supplier, or would obtain cocaine independently from the Florida supplier, but the evidence demonstrated that these three collaborated sufficiently to support the finding that their agreement represented a single conspiracy.

We will address the specific claims of these three serially. Vince Donovan and Shea, in their joint brief, argue that there was no single conspiracy because they were competitors not companions; they conducted separate businesses, and the government proved no common purpose. They also argue that even, if the government proved a single conspiracy, they were not party to it. These arguments are spurious.

■ There is ample testimony that Vince Donovan not only participated in this agreement, but that he orchestrated it. The Florida supplier gave detailed accounts of Vince Donovan's role in procuring the cocaine. His activities included initiating contact with the

supplier, negotiating the quantity and price of the cocaine, arranging for a courier to obtain and deliver the cocaine, and paying for it. Clearly, Vince Donovan was the leader of this team, and the evidence amply supports his conviction for his role in the conspiracy.

■ With respect to Pat Shea, the evidence is more circumstantial, but no less compelling. There was testimony that Shea "invested" in several kilograms of cocaine obtained from the Florida supplier in 1987 and 1988, meaning that he provided some funds for the cocaine which entitled him to a portion of the cocaine. There are telephone records indicating that Vince Donovan contacted Shea immediately after obtaining cocaine from the Florida supplier. Also, Kizel testified that he provided cocaine to Shea that he had obtained from the Florida supplier. In addition, Kizel testified that Shea agreed to participate in the purchase of large amounts of cocaine from the Florida supplier; to further this effort, Shea agreed that a storage shed should be rented and even provided an old automobile in which to store the cocaine. The government also offered evidence of drug paraphernalia obtained from one of the storage sheds with Shea's fingerprints on it. Finally, there was testimony by fellow drug dealers and several customers of Shea and Vince Donovan that they believed Shea and Vince Donovan to be partners in the cocaine trade. The government's direct evidence clearly implicates Shea in this conspiracy, and the verdict of the jury that Shea was a coconspirator is justified.

■ Dineen complains that his role in this cocaine trafficking was so minor that he could not have known of the agreement representing a single conspiracy and could not have intended to join it. Dineen modestly downplays his contribution to the Donovan team. Dineen made five trips to Florida to obtain cocaine, which he delivered to Vince Donovan. He knew enough of the conspiracy to be able to reveal to Kizel that Steve and Vince Donovan and Shea were investing in the cocaine and to encourage Kizel to get in on it. After his arrest in 1988, in which he endeared himself to his cohorts for revealing nothing about the cocaine conspiracy, Dineen made another trip to Florida to obtain co-

caine and had another Florida cocaine trip aborted due to car trouble.

■ Notwithstanding this evidence, Dineen claims he knew nothing of the overall conspiracy. Even if true, this argument could not prevail. Coconspirators do not have to have a great deal of involvement with other conspirators. *Goines,* 988 F.2d at 759. Further, a defendant "need not be aware of all the details of the conspiracy in order to be a coconspirator." *United States v. Marshall,* 985 F.2d 901, 905 (7th Cir.1993) (citing *Blumenthal v. United States,* 332 U.S. 539, 556, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947)). That Dineen may not have been a "core" participant does not reduce his culpability. He was very much a critical part of this cocaine conspiracy solely on the basis of his role in delivering the cocaine. We have noted that minor members of a conspiracy can be held accountable for every crime committed in furtherance and within the scope of the conspiracy because every member of the conspiracy benefits from the contribution of all of the other members of the conspiracy. *Goines,* 988 F.2d at 760–61. For his efforts, Dineen was paid handsomely and his expenses reimbursed. The evidence of Dineen's participation more than adequately supports his conviction for its crimes.

In addition, these three defendants also claim that the proof offered by the government at their trial "varies" from the charge of a single conspiracy in the indictment; the government actually proved multiple conspiracies. We have noted that a claim of "variance" is to be treated as a claim of insufficiency of the government's evidence. *Townsend,* 924 F.2d at 1389. We find that the government's evidence was sufficient to support the defendants' convictions as to a single conspiracy.

**B. Motions for Severance**

■ Shea and Vince Donovan claim that the district court improperly denied their motions for severance. They claim they were prejudiced by the "spillover" effect of evidence offered against other defendants. In ruling on a motion for severance, the district court must balance the benefit of

judicial efficiency in a joint trial with the risk of prejudice to the defendant. *United States v. McAnderson*, 914 F.2d 934, 949 (7th Cir. 1990). The defendant's burden is to demonstrate "severe prejudice" resulting from the district court's refusal to sever. *United States v. Curry*, 977 F.2d 1042, 1050 (7th Cir.1992) (quoting *United States v. Velasquez*, 772 F.2d 1348, 1352 (7th Cir.) *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1985)). We review such a refusal to sever for an abuse of discretion. *McAnderson*, 914 F.2d at 948.

 What Shea and Vince Donovan claim to be spillover of evidence offered against other defendants is simply evidence of the single conspiracy of which they were all convicted. They can point to no evidence offered against a codefendant that does not relate to the single conspiracy, much less explain how such evidence even slightly prejudiced them. We find that the district court properly balanced the factors before it and acted correctly in denying the motion to sever.

## C. Testimony of Wanda Young

In his appellate brief, Steve Donovan claims that Wanda Young should not have been allowed to testify because she relied on documentary evidence improperly taken from Steve Donovan and given to the IRS. He did not object to her testimony during the trial, and we review the admissibility of her testimony for plain error. Fed.R.Crim.P. 52(b).

It is clear that Young's testimony was based on her personal experience. She did not allude at any point during her testimony to any documentation provided to the IRS. The district court did not commit error plain or otherwise in admitting Young's testimony.

## D. Government's Closing Argument

 Steve Donovan, Vince Donovan, and Shea claim that certain remarks made by the government during closing argument denied them a fair trial and that other remarks violated their Fifth Amendment right against self-incrimination. We review the government's remarks that allegedly denied these men a fair trial in two steps. First, we must examine the remarks in isolation to determine whether they were improper. *United States v. Spivey*, 859 F.2d 461, 465 (7th Cir. 1988). Only if we find the remarks improper do we evaluate them in light of the entire trial transcript to determine whether they served to deny the defendants a fair trial. *Id.* In this case, we do not reach the second step; neither set of remarks was improper.

 The defendants first complain that the government acted improperly in referring to the effect of cocaine on the lives of two witnesses as demonstrated by the evidence presented at trial.[1] A prosecutor is permitted to make statements regarding the evidence admitted against a defendant and to argue to the jury any reasonable inferences drawn therefrom. *United States v. Tipton*, 964 F.2d 650, 656 (7th Cir.1992). Indeed, we refuse to "adopt [the] defendant[s'] curious view that it is improper for the prosecutor to argue to the jury that a defendant is guilty." *Id.* (citing *United States v. Auerbach*, 913 F.2d 407, 418 (7th Cir.1990)).

 Steve Donovan likens these remarks to the "send a message to drug dealers" comments that were held to be improper and which alone denied the defendant a fair trial in *United States v. Solivan*, 937 F.2d 1146 (6th Cir.1991). The comments in this case are not remotely close to those in *Solivan*. Here, the prosecutor in his rebuttal restated evidence adduced at trial and asked that the

---

1. The prosecutor's remarks are as follows: [W]hat does the evidence show was the effect of all of that cocaine? Well, at least one person, Rick Kizel, looked at the cars and the houses and the toys and decided that he would—in spite of what he said was his disdain for drug dealing—that he was going to just forget that and try to get a piece of the action. It put at least one person that you heard about into expensive drug rehabilitation programs twice and made her pawn items, household items, again and again and again in order to go out and get more. And at least one time that you saw on videotape a small child found himself in the proximity of cocaine. Common sense tells you ... that these three items were not the only ill effects of the cocaine that these defendants brought into the community through their joint efforts.

jury consider this evidence in its deliberations.

 These defendants also take issue with the government's statement offered in rebuttal, that the closing argument by defense counsel imploring the jury to acquit the defendants unless they find a "hub and wheel" conspiracy, was "an irrelevant sideshow;" they claim that this remark was improper and denied them a fair trial. First, the government's remark was invited by defense counsel's closing argument. *See Spivey*, 859 F.2d at 466. Second, the remark was an entirely proper argument that the organization of the conspiracy was irrelevant and that the jury's inquiry should be whether the government had proved the existence of a single agreement among the coconspirators. *See Townsend*, 924 F.2d at 1392. Here, the government acted properly within the scope of rebuttal argument, and the defendants' arguments fail.

 Finally, these defendants claim that their right against self-incrimination was violated by the government's remarks that allegedly shifted the burden of proof from the government to the defendants. In evaluating this claim, we must determine whether 1) it was the prosecutor's manifest intention to refer to the defendant's silence, or 2) the remark was of such a character that the jury would "naturally and necessarily" take it to be a comment on the defendant's silence. *United States v. Ramos*, 932 F.2d 611, 616 (7th Cir.1991) (citations omitted).

 The defendants failed to specify what comments constitute this egregious abrogation of their rights; they did, however, provide this court with citations to the record of pages they believe contain improper remarks by the government. Having read these pages, we believe the defendants are referring to remarks by the government disputing the defendants' characterization of their conduct and focusing the jury's attention on the alleged single agreement that the government was attempting to prove. The government did not refer to the defendants' silence, and no rational jury could take it that way. Thus, this claim also fails.

**E. Instructions**

The defendants complain that the district court failed to give the jury their instruction regarding a multiple conspiracy theory. In addition, Dineen, Shea, and Vince Donovan complain that the district court failed to give the jury a multiple conspiracy instruction at all. The defendants tendered the following instruction:

Although the Indictment charges a single conspiracy, it would be possible to find separate conspiracies throughout the period alleged in Count I. Whether there was one or more conspiracies, or none at all, is a fact for you to determine in accordance with these instructions. . . .

Defendants' theory of defense is that the evidence does not show that all Defendants were involved in a single conspiracy, but that there were a number of separate conspiracies involving the purchase and sale of contraband. That some or all Defendants may have been involved in some acts but not others and performed certain acts inconsistent with the allegation of a single, on-going conspiracy which forms the basis of separate enterprises, transactions, buy/sell relationships and conspiracies. . . .

The district court instructed the jury as follows:

In order to sustain its burden of proof the government must establish that a single conspiracy as alleged existed. Proof that a particular defendant was a member of some other conspiracy is not sufficient to convict. On the other hand, proof that a particular defendant was a member of some other conspiracy would not prevent you from returning a verdict of guilty as to that defendant should you also find that the evidence establishes beyond a reasonable doubt that he was a member of the conspiracy charged in the indictment.

The defendants' theory of the defense is that the evidence does not establish that the defendants were involved in the single conspiracy.

 In reviewing the fitness of jury instructions to which objections were properly raised in the proceedings below, "we must determine from looking at the charge as a

whole, 'whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues.'" *Boykins,* 9 F.3d at 1285 (quoting *Trustees of Indiana Univ. v. Aetna Casualty and Sur. Co.,* 920 F.2d 429, 437 (7th Cir. 1990)). A defendant is not entitled to have a particular instruction presented to the jury, but only to have his theory of the defense presented. *United States v. Boucher,* 796 F.2d 972, 976 (7th Cir.1986). If the instructions are fair and accurate summaries of the law, they will not be disturbed on appeal. *Boykins,* 9 F.3d at 1285 (citing *United States v. Doerr,* 886 F.2d 944, 960 (7th Cir.1989)). In addition, the trial judge is given substantial discretion with respect to the specific wording of the instruction. *United States v. Penson,* 896 F.2d 1087, 1090 (7th Cir.1990).

 The district court in this case properly stated the law and captured the substance of the defendants' theory of the case. It focused on the government's theory that the coconspirators belonged to a single conspiracy. In addition, the instruction given informed the jury it could not convict if it found that a defendant belonged to a conspiracy other than the single conspiracy charged. The district court properly instructed the jury, and the defendants suffered no prejudice from the district court's refusal to give the tendered rather confusing instruction.

F. Sentencing

 Dineen, Shea and Vince Donovan contend that the district court erred in calculating the quantities of cocaine attributable to each of them for sentencing purposes. They assert that the district court attributed amounts of cocaine to them for sentencing purposes which were part of transactions in which they were neither directly involved nor able to foresee. "The amount of drugs involved in a conspiracy is a factual determination by the sentencing court which we review for clear error only." *United States v. Campbell,* 985 F.2d 341 (7th Cir.1993) (citing *United States v. Cochran,* 955 F.2d 1116, 1124 (7th Cir.), *cert. denied,* ── U.S. ──, 113 S.Ct. 460, 121 L.Ed.2d 368 (1992)). Each coconspirator is responsible for the amount of cocaine he actually distributed and the amount involved in transactions reasonably foreseeable to him. *Goines,* 988 F.2d at 775. The derivative nature of coconspirator liability "makes it imperative to determine the scope of the conspiratorial agreement each joined." *Id.* (quoting *United States v. Thompson,* 944 F.2d 1331, 1344 (7th Cir. 1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 1177, 117 L.Ed.2d 422 (1992)). "[T]he determination of the base offense level involves a separate inquiry that is made by the sentencing judge, for a general verdict does not establish with whom a defendant conspired or the quantity of drugs encompassed by the conspiracy." *United States v. Edwards,* 945 F.2d 1387, 1391 (7th Cir.1991), *cert. denied sub nom, Martin v. United States,* ── U.S. ──, 112 S.Ct. 1590, 118 L.Ed.2d 308 (1992).

 With respect to the sentencing hearings of all three defendants, the district court stated for the record that it understood its obligation to make specific findings and stated the basis for its findings as to the amount of cocaine attributable to each defendant. The district court attributed between five and fifteen kilograms of cocaine to Steve Dineen. It adopted paragraphs ten and twelve of the presentence report in support of its finding and stated that "it is not even close to argue that it is less than five [kilograms]." While Dineen argues that this amount was not reasonably foreseeable to him, the evidence demonstrates that in excess of five kilograms can be attributed to Dineen for his direct involvement with transporting or planning to transport cocaine. Therefore, the district court did not commit clear error with respect to the amount of cocaine attributable to Dineen.

 With respect to Shea's sentencing, the district court determined that fifteen kilograms of cocaine could be attributed to Shea. It noted the evidence adduced at trial, the presentence report, and the addenda to the presentence report as providing the factual basis for its conclusion. In doing so, the district court also noted that when combined with the amount of cocaine directly attributable to Shea, the amount of cocaine reasonably foreseeable by him in the context of this cocaine conspiracy put the total amount attributable to him at exceeding fifteen kilo-

grams. The evidence clearly supports the district court's conclusion as to Shea's base amount, and we find that the district court did not commit clear error in its determination.

The district court attributed in excess of fifteen kilograms of cocaine to Vince Donovan. As its factual basis for this finding, the district court adopted the evidence detailed in paragraphs ten through seventeen, twenty-three, twenty-four, twenty-six and thirty-two of the presentence report and the testimony offered as evidence at the trial. The record demonstrates that Vince Donovan was directly involved in cocaine transactions which collectively exceeded fifteen kilograms. We hold that the district court did not commit clear error in making this assessment and agree with it that Donovan's position that he should be attributed less should be rejected "as being beyond all bounds of reasonableness, given the state of the evidence."

Vince Donovan also complains that the district court erred by increasing his offense level by two points upon finding that he was an organizer, leader, manager, or supervisor of the conspiracy pursuant to Federal Sentencing Guidelines § 3B1.1. We review for clear error a sentencing finding that a defendant played an aggravating role in an offense. *Goines,* 988 F.2d at 777. "Under the Guidelines, those who play an aggravating role in the offense are to receive sentences that reflect their greater contributions to the illegal scheme." *United States v. Brown,* 944 F.2d 1377, 1381 (7th Cir.1991). The district court is in the best position to determine each defendant's relative culpability. *Goines,* 988 F.2d at 777 (citing *United States v. Tetzlaff,* 896 F.2d 1071 (7th Cir. 1990)).

Vince Donovan led this conspiracy. The Florida supplier testified that Vince Donovan organized the transactions, both for himself and for others, arranged for the couriers to transport the cocaine, and usually had the shipments of cocaine delivered to him. Also, Vince Donovan provided Dineen legal help when he was arrested. There is ample evidence here to find that Vince Donovan merited a two point enhancement to his base offense level.

## III. Conclusion

The district court administered an eminently fair trial of these defendants, and the evidence clearly supports their convictions and sentences. Therefore, the convictions of Steven Donovan, Vincent C. Donovan, Patrick A. Shea, and Stephen J. Dineen are

AFFIRMED.