AMERITECH CORPORATION, Plaintiff,

v.

E. Michael McCANN, in his official capacity as District Attorney of Milwaukee County, Wisconsin, Defendant.

No. 99–C–0675.

United States District Court, E.D. Wisconsin.

March 16, 2004.

Anthony S. Baish & David T. Flaherty, Godfrey & Kahn, Milwaukee, WI, Craig A. Knott, SBC Ameritech, Chicago, IL, for Plaintiff.

Donald V. Latorraca & Paul L. Barnett, Wisconsin Depart of Justice, Office of the Attorney General, Madison, WI, for Defendant.

## DECISION AND ORDER

RANDA, Chief Judge.

The case is before the Court following the court of appeals' reversal of a prior decision of this Court which had granted McCann's motion to dismiss on the ground that the action violated the Eleventh Amendment. This procedural history is implicated by the parties' pending motions for summary judgment and therefore will be summarized.

## BACKGROUND

Ameritech Corporation ("Ameritech") filed this action against defendant, E. Michael McCann ("McCann"), seeking a declaration that McCann, the District Attorney of Milwaukee County, was required to comply with certain provisions of the Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2701–2711 ("ECPA" or "the Act"). Specifically, it sought a declaration that it is entitled to reimbursement for costs incurred in searching for assembling, reproducing and providing information subpoenaed by McCann's office pursuant to 18 U.S.C. § 2706.[1]

On July 20, 2000, the Court issued a decision and order denying McCann's motion to dismiss for lack of subject matter jurisdiction, holding that a federal question is presented by McCann's complaint and an actual controversy exists. (Court's July 20, 2000, Decision and Order at 2, 7). The Court also rejected McCann's contention that abstention is proper. *Id.* at 8–10. However, the Court noted that the parties had raised, but not fully briefed, the issues of whether application of § 2706 to a state agency would violate the Tenth Amend-

1. Section 2706 of Title 18 of the United States Code provides:

(a) Payment.-Except as otherwise provided in subsection (c), a governmental entity obtaining the contents of communications, records, or other information under section 2702, 2703, or 2704 of this title shall pay to the person or entity assembling or providing such information a fee for reimbursement for such costs as are reasonably necessary and which have been directly incurred in searching for, assembling, reproducing, or otherwise providing such information. Such reimbursable costs shall include any costs due to necessary disruption of normal operations of any electronic communication service or remote computing service in which such information may be stored.
(b) Amount.-The amount of the fee provided by subsection (a) shall be as mutually agreed by the governmental entity and the person or entity providing the information, or, in the absence of agreement, shall be as determined by the court which issued the order for production of such information (or the court before which a criminal prosecution relating to such information would be brought, if no court order was issued for production of the information).
(c) Exception. The requirement of subsection (a) of this section does not apply with respect to records or other information maintained by a communications common carrier that relate to telephone toll records and telephone listings obtained under section 2703 of this title. The court may, however, order a payment as described in subsection (a) if the court determines the information required is unusually voluminous in nature or otherwise caused an undue burden on the provider.

ment and whether § 2706 preempts state law and set a schedule for supplemental briefing on those issues. *Id.* at 10–11.

Thereafter, on December 17, 2001, this Court issued a decision and order granting McCann's motion to dismiss, holding that Ameritech's claim brought under the Declaratory Judgment Act was barred by state sovereign immunity and did not fall within the exception to sovereign immunity for suits seeking prospective equitable relief against state officials. *See Ameritech Corp. v. McCann,* 176 F.Supp.2d 870, 877–80 (E.D.Wis.2001). In the alternative, the Court held that § 2706(b), the ECPA subsection authorizing a suit against a state in the state's own court, violated the principle of state sovereign immunity. *Id.* at 881.

Upon appeal by Ameritech, the court of appeals issued a decision on July 22, 2000, ruling that the action sought only prospective relief and thus was not barred by the Eleventh Amendment. *See Ameritech Corp. v. McCann,* 297 F.3d 582, 585–88 (7th Cir.2002). The court emphasized "[i]n this case, no past breach of Section 2706 is at issue because Ameritech seeks only a declaration of rights that will force McCann to conform his *future conduct* to federal law." *Id.* at 587. Further,"Ameritech's suit seeks no reimbursement for McCann's previous noncompliance, but rather a declaration that he must comply with Section 2706 in the future." *Id.* at 588.

The court declined McCann's request to determine whether automated message accounting studies ("AMA's") really fall within the preview of § 2706, because it was irrelevant to the Eleventh Amendment issue, and questions of fact remained which could not be decided on a motion to dismiss. *Id.* at 588–89. Specifically, the appellate court held that the "parties dispute whether an AMA is an existing record or whether the production of an AMA requires additional compilation beyond the information stored by Ameritech, noting that the precise nature of an AMA is important because reimbursement under the Act is unnecessary for 'records or other information maintained by a communications common carrier that relate to telephone toll records and telephone listings obtained under Section 2703.'" *Id.* at 588 (*quoting* 18 U.S.C. § 2706[c] ). The matter was remanded for further proceedings consistent with the appellate opinion.

Upon remand, Ameritech filed a motion for leave to file an amended complaint intended to incorporate factual changes which had taken place during the pendency of the prior motion to dismiss and the appeal. The motion was granted by order dated December 4, 2002.

After further discovery, cross-motions for summary judgment were filed which are ready for resolution. The Court declines Ameritech's request to entertain oral argument as an aid in "sifting through the numerous and dubious arguments" made by McCann. (Ameritech's Request for Oral Argument at 1). The parties have adequately set forth their respective positions.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." *See Anderson,*

477 U.S. at 248, 106 S.Ct. 2505. A dispute over "material facts" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of showing the needlessness of a trial—(1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law—is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### RELEVANT FACTS [2]

Ameritech is a Delaware corporation whose principal place of business is in Illinois. Ameritech owns Wisconsin Bell, Inc., which provides telephone services in Wisconsin. Ameritech is a provider of "electronic communications" in Wisconsin as that phrase is defined in 18 U.S.C. § 2510(12).

McCann, who is sued in his official capacity, is the duly elected district attorney in and for Milwaukee County, Wisconsin and has held that position since 1969. McCann and his legal staff are employees of the State of Wisconsin. In his capacity as District Attorney of Milwaukee County, McCann investigates criminal offenses and prosecutes alleged offenders of state and local laws. Jon Reddin ("Reddin"), joined the Office of the Milwaukee County District Attorney in 1973, and has served as a Deputy Milwaukee County District Attorney since 1992. Reddin has been the point person for McCann on the issue of compensation to Ameritech since the mid–1990s and his statements reflect the policy of the Milwaukee County District Attorney's office, subject to being overridden by McCann.

Ameritech's network uses a series of "central offices." A central office provides "dial tone" to customers making phone calls and contains "switches" that route the calls to their proper destinations. When a customer places a call, the call is captured in the central office and creates a message that documents the call occurring. Thousands of fields are recorded. The recording of this information is a function that is regularly performed in the normal course of Ameritech's business.

The method used by the central office to record information about outgoing ("originating") telephone calls placed on the telephone system is "Automated Message Accounting" ("AMA") whereby "[o]riginating phone calls are electronically recorded in the originating [central] office of the call." The electronically recorded information about an outgoing call includes the originating number, the duration of the call, the date and time and the number called (the "terminating number"), any calling features used, whether the call was operator assisted or international, and if a long distance call, carrier information. The recorded information about originating calls

---

2. As a general matter, unless accompanied by citation, the relevant facts are taken from the parties' proposed findings of fact which are not disputed. Citations to sources of quoted excerpts have been included even when those excerpts are undisputed.

 Pursuant to Civil L.R. 56.2(e), the Court has concluded that there is no genuine material issue as to proposed findings of fact to which there was no response. Any factual statements which are disputed and do not have support in the record were disregarded for purposes of this decision. To the extent an objection to the proposed findings of fact failed to cite specific evidentiary support, the objection was given no weight. The Court need not scour the record to determine whether there exists a genuine issue of fact to preclude summary judgment. *L.S. Heath & Son, Inc. v. AT&T,* 9 F.3d 561, 567 (7th Cir. 1993).

is stored in "data sets" on magnetic computer tapes. In Wisconsin, approximately 25 million calls per day are collected on Ameritech's network from customers originating phone calls and from other telecommunication companies originating calls on the Ameritech network. The information about these Wisconsin telephone calls is stored in approximately 24 data sets.

In the normal course of Ameritech's business, the information about the originating calls is used to create Ameritech's phone bills and message unit detail ("MUD") records and to resolve billing disputes. The Electronic Billing Accuracy Center ("EBAC") ensures the integrity of Ameritech's billing. EBAC addresses billing issues exclusive to Ameritech as well as billing issues with other telephone companies with whom Ameritech companies may have had contact. EBAC typically handles inquiries that involve thousands of calls. A typical referral to EABC includes a situation where a customer is billed long distance for a call the customer believed was local. EBAC addresses issues regarding billings on trunk groups,[3] and determines whether a trunk group is set up correctly so that it produces billings. EBAC also investigates calls that are processed but for which no one was billed—such calls are normally in the high 100s or 1,000s.

In addition, EBAC investigates complaints from other carriers. In disputes with other carriers, EBAC provides data or information from the other carrier that is in the form of an AMA, which is similar to the format Ameritech uses.

EBAC staff conduct originating AMA scans. EBAC does not keep track of the number of originating or terminating AMA scans conducted. Ameritech cannot predict which of its customers will complain about telephone calls and it cannot predict which calls might be the subject of a challenge or a complaint.

In the normal course of their duties, Ameritech staff handle requests for AMA reports from Ameritech Asset Protection managers.[4] There is no difference in the process used to prepare an AMA report whether requested for an internal investigation or by law enforcement. The source of the data in either instance is the same.

Ameritech Asset Protection Area managers have requested both originating and terminating AMA reports during the course of their employment. For instance, originating and terminating telephone records may be pertinent to an investigation concerning a customer harassment complaint or an employee who is being harassed or is suspected of abusing telephone privileges. Data or information that relates to originating or terminating telephone calls is relevant to the investigation of telecommunications crime by the Ameritech Asset Protection Area managers. From February through December for calendar year 2001, 98 AMA reports were prepared in response to requests by Ameritech Asset Protection Area managers. During the calendar year 2002, Am-

---

3. A trunk group is what a telephone call routes over.

4. Ameritech Asset Protection Area managers conduct internal investigations of company code of conduct violations, which are broader than criminal violations. (Non-criminal code violations include employees accessing their own records for their own use, misusing company property for personal reasons, abusing or excessively using electronic mail systems, accessing pornography, taking money from a customer; misuse of proprietary information, abusing customers and engaging in workplace violence.) They also investigate telecommunications crimes, including theft of property, damage to property and deliberate interruptions of service and non-Ameritech employees, such as following the commission of crimes against Ameritech.

eritech Asset Protection Area managers requested a total of 107 AMA reports.

Law enforcement often requests that Ameritech, under the provision of legal process, provide information about incoming calls to a given phone number. In 2002, Ameritech received approximately 4,290 demands for terminating AMA reports in its five-state region. Of this only 107 were for Ameritech's asset protection personnel. Through July 2003, Ameritech received approximately 3,603 demands for terminating AMA reports in the same region. Of this, only 97 were for an entity other than law enforcement.

At some point (after 1996, when Ameritech first sought to impose a pricing schedule on Wisconsin law enforcement), Ameritech adopted a "comply and bill" policy. This policy provided that the subpoena control staff was to respond to legal process from law enforcement and then follow up with an invoice. Ameritech officials maintain that Ameritech does not charge law enforcement for providing the AMA reports for the purpose of discouraging law enforcement from requesting the information contained in those reports or to reduce the number of AMA reports that Ameritech must prepare. Law enforcement agencies in Wisconsin, including in particular Milwaukee County, request a disproportionately large number of AMA reports as compared to other states and cities within the Ameritech five state region. Many state and local law enforcement agencies in other states and communities within the Ameritech five state region pay Ameritech for producing AMA reports in response to legal process.

In Milwaukee County, county, city and other municipal law enforcement officers conduct investigations of the violation of Wisconsin state criminal and other laws. When law enforcement officers in Milwaukee County determine that a criminal investigation would benefit from the production of certain documents they refer their request to the Milwaukee County District Attorney. Assistant district attorneys within the Milwaukee County District Attorney's office prepare or oversee the preparation of the paperwork to submit to a local state court judge or court commissioner.

The paperwork typically includes a sworn affidavit from the law enforcement officer that establishes probable cause to believe that a criminal offense has been committed and that the documents may be evidence of the crime, a petition to the court for the issuance of a court-ordered subpoena, a proposed court order and a proposed subpoena. The subpoena typically includes a specific date and time when the documents must be produced before the judge or court commissioner. In lieu of actual appearance and for the convenience of the record custodian, however, the subpoena also typically provides that the documents may be produced prior to that date to the requesting law enforcement officer or agency.

After the paper work is completed, the assistant district attorney submits it to the judge or court commissioner for review. Following review and if probable cause is shown, the judge or court commissioner will sign and date the court order and the subpoena. After the judge or court commissioner signs the order and the subpoena, all of the paperwork is returned to the requesting law enforcement officer. The requesting law enforcement officer then typically serves a copy of the subpoena on the entity who has custody or control of the subpoenaed documents.

When a law enforcement officer believes that telephone records may aid a criminal investigation, the process for obtaining a court-issued subpoena as described above is followed. Milwaukee County law en-

forcement officers request court-issued subpoenas for business records directed to Ameritech.

On September 15, 1997, the Milwaukee County District Attorney's Office received a letter from the director of corporate security for Ameritech, Jim Humphrey ("Humphrey"), and a booklet entitled "Obtaining Customer Records from Ameritech for Legal Investigations." The Humphrey letter advised that Ameritech planned to begin billing for AMA searches on January 1, 1998.

According to McCann and Reddin, knowing the originating number of a call directed to a particular number, the date and the time of those calls and the duration of those calls is helpful in carrying out their law enforcement duties. Ameritech employs two full time employees, Rose Vecchione ("Vecchione") and Constance Willis ("Willis"), who interact with law enforcement about the information they need, compose and run terminating AMA searches and transform raw data from that search into a report that is understandable. Other Ameritech employees run and maintain the computer systems used by Vecchione and Willis.

When Ameritech is served with legal process from law enforcement, the legal process is directed to a centralized processing center in Dallas, Texas where it is evaluated for facial validity. Process regarding one of the five Ameritech states, including Wisconsin, is directed to Ameritech's asset protection (security) department in Hoffman Estates[5] or Chicago, Illinois. The legal process is divided between Vecchione (who handles Michigan, Ohio, and area codes 414, 262 and 920 in Wisconsin) and Willis (who handles Illinois,

Indiana and area codes 608 and 715 in Wisconsin.)

Vecchione and Willis review and analyze each subpoena or court order. It is not unusual for them to have one or more clarifying telephone calls with the law enforcement agency that issued the legal process. Vecchione and Willis then draft a worksheet to cull from the subpoena the information they need to create a search for the information. Following procedures, Vecchione and Willis then craft the terminating AMA search. The process takes about one hour for each subpoena or court order.

A specially designed computer program then begins searching every single outgoing call to find what calls, if any, might have been placed to the number in which law enforcement is interested. This means searching every single outgoing telephone call in Wisconsin (approximately 25,000,000 calls per day) to see if the terminating number in question shows up on a bill.

A search for all calls made to one number over three days takes approximately a half hour of computer time, a seven-day search takes a little more than one and a half hours, a 30–day search takes about 20 hours and, a 60–day search takes about 32.86 hours. During this period, data sets—which are normally used to settle billing disputes and discrepancies when both the terminating and originating numbers are known—cannot be accessed by anyone else.

The result of the computer search is a large amount of raw data and a preliminary report that is meaningless to lay persons.[6] Vecchione and Willis next translate the raw data into a form understandable to

---

**5.** Hoffman Estates is a village located in Illinois, which was incorporated in 1959. See http://search.state.il.us/search97cgi./97is. dll/Action last visited March 8, 2004.

**6.** The raw data from a 20–day search—from January 1 through January 30, 2003,—of calls to a Milwaukee County phone number is attached as Exhibit B to the Declaration of Rose Vecchione.

law enforcement and edit a final report to limit the data to the dates identified in the subpoena and place the data in chronological order. A translated and edited version of the raw data in Exhibit B to the Declaration of Rose Vecchione is contained in Exhibit C to that declaration. The final report, called a "terminating AMA report," is transmitted to the law enforcement officer or entity that issued the subpoena or court order. A typical AMA report provided to law enforcement in response to legal process includes data on the date of the call, the originating telephone number including area code, the terminating telephone number including area code, the time that the call is connected, the duration or length of the call, and the carrier code.

Ameritech filed this lawsuit on June 17, 1999. In a December 2001 e-mail to over 40 other law enforcement officials, Reddin wrote: "Our position was, as it has always been, that a lawful state subpoena requires production of the records listed, without precondition or payment." (Declaration of Anthony S. Baish [Baish Decl.] Exhibit [Exh.] G).[7] In a February 24, 1998, letter, Reddin stated: "We also dispute Ameritech's right to bill for production of these records when they are lawfully subpoenaed." (Baish Decl., Exh. H). Reddin wrote in an April 5, 1999, letter addressed to Stephen J. Liccione of Ameritech, "Your letter leads me to believe that you misunderstand law enforcement's position. We do not concede what you refer to as charge for these records." (Baish Decl., Exh. I).

In an affidavit dated November 19, 1999, Reddin averred:

> Except in the case of medical records, I do not believe that Wisconsin law provides a records custodian with the right to compensation for costs associated with the production of documents in criminal investigations. In the past, my colleagues and I have successfully objected to records custodians efforts to charge back to law enforcement or the district attorney's office the costs of subpoena enforcement. I also do not believe that the federal statute under which Ameritech seeks compensation preempts state law governing criminal investigatory subpoenas.

(Baish Decl., Exh. J [November 19, 1999, Affidavit (Aff.) of Jon Reddin] ¶ 7). At his May 23, 2003, deposition Reddin testified: "We simply don't believe that it [the ECPA] applies." (Baish Decl., Exh. F at 95:15–16). Reddin also testified that he believed that Wis. Stat. § 968.135 is the authority for obtaining AMA reports and that he did not believe that the ECPA preempted that statute. Reddin further testified that even if the ECPA does apply, the subpoenaed records and information are exempt from payment under the terms of the ECPA itself. Also if they are not exempt, absent agreement or a court order Ameritech is not entitled to payment.

Apparently, some law enforcement personnel came to the District Attorney and the Deputy District Attorney with complaints about Ameritech's responses to subpoenas.

### ANALYSIS

In support of his motion for summary judgment, McCann asserts that there is no justiciable "case" or "controversy." McCann acknowledges that previously the Court denied his motion to dismiss on this ground, however, he states that at that time discovery had not yet disclosed that Ameritech produces the subpoenaed records to police agencies and not to the district attorney and that Ameritech has never sought compensation from the district attorney but instead billed the law

---

7. The subject reference on the e-mail is "Ameritech Decision" and relates to this Court December 17, 2001, decision dismissing the action. (Baish Decl., Exh. G)

enforcement agencies directly. In addition, McCann maintains that the complaint did not highlight the absence of an attorney-client relationship or principal-agent relationship with these other agencies such that McCann's opinion of the law is not binding upon them. Absent authority to bind these agencies, McCann argues this opinion is jurisdictionally no more significant than any other public official's opinion on the issue. Therefore, he asserts the basis for this Court's prior determination that an actual controversy exists is undermined and that subject matter jurisdiction is lacking and the case should be dismissed.

Alternatively, McCann maintains that the Court should exercise its discretion and decline to issue a declaratory judgment. In addition, McCann contends that insofar as it may be determined that the ECPA requires compensation to Ameritech for its costs in responding too legal process, the ECPA violates the Tenth Amendment as applied to state and local government entities and officials in the investigation and prosecution of state and local crimes. Further, McCann maintains that Ameritech cannot meet its burden of showing that the ECPA preempts Wis. Stat. § 968.135.[8] Moreover, McCann argues that the AMA records which Ameritech produces in response to legal process issued by the Wisconsin state courts are exempt from the compensation requirement of the ECPA, but that if this Court declares the ECPA's compensation applies to Ameritech's AMA records, then it should also declare the scope and limits of Ameritech's entitlement to compensation.

In support of its motion for summary judgment, Ameritech argues that the ECPA is the only authority under which McCann can compel Ameritech to create or prepare a terminating AMA report—something that would not exist independent of law enforcement's subpoena.[9] It maintains that § 2706(a) is applicable because each terminating AMA report is a unique creation, rather than a telephone toll record. Ameritech maintains that such contention is supported by the undisputed facts, the plain language of the ECPA, the ECPA's legislative history, case law, and the testimony of Milwaukee County's Deputy District Attorney who has admitted that terminating AMA reports are not telephone toll records.

### Case or Controversy

McCann's challenge to the existence of a "case or controversy"[10] and his contention,

---

**8.** Section 968.135 of the Wisconsin Statutes, provides:

> Upon the request of the attorney general or a district attorney and upon a showing of probable cause under s. 968.12, a court shall issue a subpoena requiring the production of documents, as specified in s. 968.13(2). The documents shall be returnable to the court which issued the subpoena. Motions to the court, including, but not limited to, motions to quash or limit the subpoena, shall be addressed to the court which issued the subpoena. Any person who unlawfully refuses to produce the documents may be compelled to do so as provided in ch. 785. This section does not limit or affect any other subpoena authority provided by law.

W.S.A. 968.135.

**9.** Ameritech points out that McCann's brief in support of his motion for summary judgment is 44 pages long—14 pages longer than the maximum allowed by Civil L.R. 7.1(f) (E.D.Wis.). McCann's brief is significantly over the 30–page limit. Violation of the page limits for brief set by local rule is unfair to other parties who adhere to the rule. The Court could only consider the first thirty pages or assess a fine for each excess page, but neither remedy seems quite fitting in this case.

**10.** Article III of the Constitution limits the exercise of judicial power to live cases or controversies. *Spencer v. Kemna,* 523 U.S. 1,7, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998).

in the alternative, that the Court should exercise its discretion and decline to render a declaratory judgment revisit issues previously resolved by this Court in this litigation. (Court's July 20, 2000, Decision and Order at 5–10). The "doctrine of law of the case establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the suit." *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1227 (7th Cir.1995).[11] The doctrine "merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power." *Christianson v. Colt Industries Operating Corp.,* 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (*quoting Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 [1912] [Holmes, J.] [*citations omitted* ]). "A court has the *power* to revisit prior decisions of its own ... in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was' clearly erroneous and would work a manifest injustice.'" *Id.* (*citing Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983)). Thus, invoking the law of the case doctrine, this Court could simply rely upon its prior conclusions on the existence of a "case or controversy" and that declaratory judgment is appropriate in this case.

Nonetheless, because a "case or controversy" is essential to subject matter jurisdiction and McCann has provided new information obtained in discovery, the Court will consider McCann's contention, that new information shows that in Milwaukee County, it is the police agencies that seek information from Ameritech, the police agencies that receive the information from Ameritech, and the police agencies that

are billed by Ameritech for providing that information. *See* Defendant E. Michael McCann's Brief in Support of His Motion for Summary Judgment at 3. McCann states that contrary to "Ameritech's own allegations, Ameritech does not bill the district attorney's Office." *Id.*

The problem with McCann's current position is it is contradicted by his "answer and defenses to the supplemental complaint." *Soo Line R. Co. v. St. Louis Southwestern Ry. Co.,* 125 F.3d 481, 483 (7th Cir.1997) states:

'Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them.' *Keller v. United States,* 58 F.3d 1194, 1198 n. 8 (7th Cir.1995); *see also Schott Motorcycle Supply, Inc. v. American Honda Motor Co.,* 976 F.2d 58, 61–62 (1st Cir. 1992); *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.,* 757 F.2d 523, 528 (2d Cir.1985); *Freedom Nat'l Bank v. Northern Ill. Corp.,* 202 F.2d 601, 605 (7th Cir.1953). A plaintiff can 'plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts.' *Jackson v. Marion County,* 66 F.3d 151, 153 (7th Cir.1995).

The *Soo* court notes "although the rule smacks of legalism, judicial efficiency demands that a party not be allowed to controvert what it has already unequivocally told a court by the most formal and considered means possible." *Id.*

McCann has affirmatively alleged that "the *subpoenas issued at the request of [McCann] or his staff* typically seek the production of 'documents' as defined at Wis. Stat. § 968.13(2), that evidence or reflect the receipt of incoming call(s) to a particular telephone number for a desig-

---

11. The doctrine "most often applies to issues already fully decided in cases that subsequently re-appear before the rendering court."

*Trustees of Indiana University v. Aetna Casualty & Surety Co.,* 920 F.2d 429, 435 (7th Cir. 1990).

nated period of time." (Answer and Defenses to the Supplemental Complaint, ¶ 5) (*emphasis added*). Likewise in paragraph nine, McCann has affirmatively alleged that the Ameritech maintains documents ... "otherwise, [Ameritech] would be unable to produce any documents *in response to the subpoenas obtained by [McCann] or his staff*." *Id.* at ¶ 9 (*emphasis added*). Thus, McCann has admitted that he and/or his staff have sought the type of information placed at issue by Ameritech's action.

■ McCann's answer also concedes that Ameritech has sought reimbursement from him. In the first sentence of paragraph 11 of its amended complaint, Ameritech alleges that it "has requested that McCann reimburse it as called for by 18 U.S.C. § 2706(a)." In turn, McCann responds: "Defendant ADMITS the allegations in sentence 1 of paragraph 11 of the supplemental complaint insofar as it is alleged that plaintiff has requested reimbursement. Defendant DENIES the remaining allegations of sentence 1 of paragraph 11." (Answer and Defenses to the Supplemental Complaint, ¶ 11). The pleadings establish both that McCann has sought the information at issue and that Ameritech has sought reimbursement from McCann and McCann is bound by his admissions.[12] *Soo Line R. Co.*, 125 F.3d at 483.

McCann argues he has not been "billed" for the records. However, 18 U.S.C. § 2607 states in pertinent part a "governmental entity obtaining the contents of communications, records, or other information under section 2702, 2703, or 2704 of this title *shall pay to the person or entity assembling or providing such information a fee for reimbursement for such costs as are reasonably necessary* and which have been directly incurred in searching for, assembling, reproducing, or otherwise providing such information." The word "billed" does not appear in the statute. Further, "reimburse" means "to repay." *Webster's II New Riverside University Dictionary* at 991(1984). "Bill" means "to present statement of charges or costs to" *Id.* at 172. In this context, seeking reimbursement seems synonymous with billing.

This case is distinguishable from *Illinois ex rel. Barra v. Archer Daniels Midland Co.*, 704 F.2d 935, 941 (7th Cir.1983), where the court concluded that there was no case or controversy because the Illinois State's Attorney had not made it sufficiently clear that he would criminally prosecute Archer Daniels Midland ("Archer Daniels") under a state statute that might be preempted by federal law. In the absence of a clear threat of prosecution, the appellate court found no "actual controversy," rather it found "only a potential controversy that will become actual if and when [the State's Attorney] prosecutes," *Id.* The court declined to endorse the issuance of an "advisory opinion" because it might turn out to have no consequences." *Id.* at 942. In contrast, if Ameritech prevailed then McCann would have to reimburse Ameritech for records produced pursuant to 18 U.S.C. § 2706(a).

Nor is this Court persuaded by McCann's assertion that the complaint did not "contemplate that District Attorney McCann does not maintain an attorney-client relationship or a principle-agent relationship with these agencies such that his opinion on the interpretation of the law is

---

12. Further, McCann testified at his May 20, 2003, deposition that Ameritech sought reimbursement from his office for producing an incoming telephone call report. (Baish Decl., Exh. E [Deposition of E. Michael McCann] at 31–33.) A party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit which contradicts prior deposition testimony. *See Amadio v. Ford Motor Co.*, 238 F.3d 919, 926 (7th Cir.2001).

binding on them." (Defendant E. Michael McCann's Brief in Support of His Motion for Summary Judgment at 7.) The existence of an attorney-client relationship or a principal-agent relationship is a question of law reserved for the Court.

■ The undisputed facts establish the existence of a .cooperative relationship between McCann and various law enforcement agencies in preparing the legal papers required to obtain court orders for the production of the subject records. Although varying from case to case, such assistance would necessarily involve legal assistance in an effort to demonstrate probable cause so that the judge or court commissioner will issue the order. Moreover, this action seeks a declaration regarding McCann's obligations, not the obligations of others. Thus, McCann's argument regarding the attorney-client relationship and principal-agent relationship is not persuasive. In sum, this Court again concludes that this matter satisfies the "case or controversy" requirement.

### Declaratory Judgment

McCann also reargues that this Court should not exercise its declaratory judgment powers. In its July 20, 2000, decision, the Court rejected McCann's arguments that it should abstain from deciding this action, ruling that "the Court is empowered to declare the meaning of a federal statute and it is not persuaded that it should refrain from doing so." (Court's July 20, 2000, Decision and Order at 10).

The Court relies upon that prior determination.

In that decision, the Court observed that the "dispute between Ameritech and McCann is neither vague nor abstract; it is sharply focused and very real. Ameritech claims that it is entitled to reimbursement under Section 2706 and McCann denies any obligation arising under this federal statute." *Id.* at 7. Further, the Court stated that Ameritech had "already provided the subpoenaed records and is unable to proceed confidently with negotiations or with court action under 18 U.S.C. § 2706 absent a declaration of its right to do so" *Id.* While these statements were made in analyzing the existence of an actual controversy, they also address the considerations that a district court should take into account in deciding whether to exercise its authority to issue a declaratory judgment as stated in *Public Service Commission of Utah v. Wycoff Co.*, 344 U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952), and relied upon by McCann. *See* Defendant E. Michael McCann's Brief in Support of His Motion for Summary Judgment at 9.

### Tenth Amendment

McCann asserts that insofar as it may be determined that the ECPA requires compensation to Ameritech for its costs in responding to the legal process, it violates the Tenth Amendment as applied to state and local government entities and officials in the investigation and prosecution of state and local crimes.[13]

13. In its December 17, 2001, decision, the Court commented on the Tenth Amendment issue, noting that in recent years the Supreme Court has emphasized its importance as a restraint upon congressional power. *Ameritech Corp.*, 176 F.Supp.2d at 880, n. 11 (*citing Printz v. United States*, 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 [1997]). The Court observed that when Congress legislates pursuant to one of its enumerated powers under the Constitution, such as the power to regulate

interstate commerce, it does not offend the sovereignty retained by the States under the Tenth Amendment. *Ameritech Corp.*, 176 F.Supp.2d at 880, n. 11. Further the Court stated that "[a]ssuming, *arguendo*, that Section 2706 is a regulation of *telecommunications*, and not a regulation of the subpoena power of Wisconsin courts, it is probably a valid exercise of the commerce power since telecommunications are both interstate and

■ The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const., Amend. X; *see also Alden v. Maine,* 527 U.S. 706, 712, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). Although the Constitution grants broad powers to Congress, our federalism requires that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation. *Alden,* 527 U.S. at 748, 119 S.Ct. 2240 (*citing United States v. Lopez,* 514 U.S. 549, 583, 115 S.Ct. 1624, 131 L.Ed.2d 626 [1995] [Kennedy, J., concurring]; *Printz v. United States,* 521 U.S. 898, 935, 117 S.Ct. 2365, 138 L.Ed.2d 914 [1997]; *New York v. United States,* 505 U.S. 144, 188, 112 S.Ct. 2408, 120 L.Ed.2d 120 [1992]).

■ "The Tenth Amendment does not itself demarcate the boundary dividing state from federal authority; its text 'is essentially a tautology,' *New York,* 505 U.S. at 157, 112 S.Ct. 2408, declaring only that the States retain those powers not surrendered, *id.* at 156, 112 S.Ct. 2408." *Gillespie v. City of Indianapolis* 185 F.3d 693, 704 (7th Cir.1999). Therefore, whether Congress has invaded the province reserved to the States by the Tenth Amendment is a question that must be answered by inquiring whether Congress has exceeded the limits of authority bestowed upon it by Article I of the Constitution.[14] *Id.*

In asserting the validity of the ECPA, Ameritech maintains that the ECPA regulates telecommunications, in particular, the privacy of those communications. (Ameritech Corporation's Brief in Opposition to Defendant's Motion for Summary Judgment at 16). This position is consistent with Congress's stated purpose in amending Title III of the Omnibus Crime Control Law and Safe Streets Act of 1968—the Federal wiretap law—which is " 'to protect against the unauthorized interception of electronic communications.' " *Ameritech Corp.,* 297 F.3d at 583 (*quoting* S.Rep. No. 99–541, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3555.)[15]

■ "It is clear that Congress, in exercising its Commerce Power, *could* determine that all regulation of the telecommunications industry ought to be entrusted to the federal government." *MCI Telecommunications Corp. v. Illinois Bell Telephone Co.,* 222 F.3d 323, 342 (7th Cir.2000) (addressing the 1996 Telecommunications Act); *See also, United States v. Gilbert,* 181 F.3d 152, 158 (1st Cir.1999) (telephone

commercial in character and since the preparation of the AMA studies takes time away from Ameritech's interstate commercial activities." *Ameritech Corp.,* 176 F.Supp.2d at 880, n. 11 (*citing Lopez,* 514 U.S. 549, 560, 115 S.Ct. 1624, 131 L.Ed.2d 626 [1995] ["Where economic activity substantially affects interstate commerce, legislation regulating that activity will be sustained."]). *(emphasis in original )*.

14. In *State of Mich. v. Meese,* 666 F.Supp. 974, 980–81(E.D.Mich.1987), *aff'd on other grounds,* 853 F.2d 395 (6th Cir.1988), the court rejected a Tenth Amendment challenge to Title III of the Omnibus Crime Control Act and Safe Streets Act of 1968. The ECPA is an amendment thereto. See S.Rep. No. 99–541, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3555.

15. Furthermore, the "Act generally defines the scope of a party's ability to intercept personal and proprietary communications, while at the same time recognizing the government's legitimate law enforcement needs in obtaining such information." *Ameritech Corp.,* 297 F.3d at 583. As further explained, "[t]o this end, Section 2703 of the Act sets forth the requirements for government access to private communications and states that electronic communications providers (such as Ameritech) shall furnish certain electronic records to governmental entities only under specific circumstances." *Id.* at 583–84.

used to make in-state bomb threat "is an instrumentality of interstate commerce and this alone is a sufficient basis for jurisdiction based on interstate commerce"). The Supreme Court has consistently maintained that Congress may constitutionally regulate the "channels" and "instrumentalities" of interstate commerce. *See United States v. Morrison,* 529 U.S. 598, 609, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000). Communication services provided by non-common carrier communications and new forms of telecommunications and computer technology are channels and instrumentalities of interstate commerce. As aptly stated in the House Report regarding the ECPA, "[i]n light of the importance of communications generally to interstate and foreign commerce, the prevention of unauthorized access to the systems used for such communication is a legitimate federal concern." H.R.Rep. No. 99–647 at 63. In light of the foregoing, there is a firm basis for concluding that the ECPA is a valid exercise of Congress's authority to regulate interstate commerce under the Commerce Clause, U.S. Const., Art. I, § 8, cl. 3.

■ Federal statutes validly enacted under one of Congress's enumerated powers, including the Commerce Clause-may nonetheless violate the Tenth Amendment if they commandeer the states' executive officials, *Printz v. United States,* 521 U.S. 898, 933, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), or legislative processes, *see New York v. United States,* 505 U.S. 144, 161–66, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). *See Reno v. Condon,* 528 U.S. 141, 149, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000). *See also, Gillespie,* 185 F.3d at 707–08. In enacting the ECPA, Congress intended to "protect against the unauthorized interception of electronic communications." *Ameritech Corp.,* 297 F.3d at 583 (*quoting* S.Rep. No. 99–541, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3555). The Act generally defines the scope of a party's ability to intercept per-

sonal and proprietary communications, while at the same time recognizing the government's legitimate law enforcement needs in obtaining such information. *Ameritech Corp.,* 297 F.3d at 583.

Section 2703 of the Act sets forth the requirements for government access to private communications and states that electronic communications providers (such as Ameritech) shall furnish certain electronic records to governmental entities only under specific circumstances. *Id.* at 584. With certain exceptions, § 2706 of the ECPA, obligates a governmental entity obtaining electronic records under § 2703 to "pay the person or entity assembling or providing such information a fee for reimbursement for such costs as are reasonably necessary and which have been directly incurred in searching for, assembling, reproducing, or otherwise providing such information." *Id.* The Act also urges the governmental entity and information provider to agree on the reimbursement amount, but, if, the parties cannot reach an agreement, the ECPA states that the court that issued the order for production shall determine the appropriate reimbursement calculation. *See id.*

■ While the ECPA requires McCann to pay for the telecommunications records provided pursuant to subpoena, the power to subpoena these records is not proscribed, controlled or directed by the Act. The payment requirement is a minor burden. Thus, the Act neither commandeers the states' executive officials, *Printz v. United States,* 521 U.S. 898, 933, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997), or legislative processes, and therefore does not violate the Tenth Amendment. *See Cellular Phone Taskforce v. Fed. Communications Comm'n,* 205 F.3d 82, 96 (2d Cir.2000) (holding that a federal telecommunications law preempting states' ability to regulate the health and safety issues with respect to certain personal wireless service facili-

ties does not violate the Tenth Amendment because the "statute does not commandeer local authorities to administer a federal program"); *City of New York v. United States,* 179 F.3d 29, 35 (2d Cir.1999) (holding that the Tenth Amendment is a "shield against the federal government's using state and local governments to enact and administer federal programs" not a "sword allowing states and localities to engage in passive resistance that frustrates federal programs"); *United States v. Sage,* 92 F.3d 101, 107 (2d Cir.1996); *United States v. Bostic,* 168 F.3d 718, 724 (4th Cir.1999).

### *Preemption*

McCann asserts that Ameritech cannot establish that the ECPA preempts state laws to the contrary, specifically, Wis. Stat. § 968.135. McCann states that because the ECPA does not expressly preempt state laws to the contrary, Ameritech must show that Congress implicitly intended to preempt state law and that the only basis for implied preemption would be to establish an actual conflict between federal and state law. However, states McCann, any conflict is not inevitable in this case because it is not clear that Congress intended that the ECPA's compensation requirement apply to state and local agencies.[16]

Ameritech maintains that "McCann's argument is a textbook example of misusing snippets of legislative history in an effort to turn the plain language of a statute on its head and, therefore, must be rejected." (Ameritech Corporation's Brief in Opposition to Defendant's Motion for Summary

Judgment at 20). Relying upon the plain language of 18 U.S.C. § 2706(a), Ameritech contends that the ECPA expressly subjects "governmental entities" to regulation and compares the term "governmental entities" as used in the ECPA to the term "federal" entities in the Right to Financial Privacy Act, 12 U.S.C. § 3401.

■ Article VI of the Constitution provides that "the Laws of the United States ... shall be the supreme Law of the Land ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. It is pursuant to the Supremacy Clause power that Congress, in the exercise of its constitutionally afforded legislative authority, may preempt state law. *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 368, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). In determining whether the Congress has preempted state law, the Court's task is to discern congressional intent. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381–82, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). Preemption "will not lie unless it is 'the clear and manifest purpose of Congress.'" *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (*quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 [1947]). The Supreme Court has instructed courts to be reluctant in finding federal preemption of a subject "traditionally governed by state law." *Id.* Evidence of preemptive purpose "is sought in the text and structure of the statute at issue." *Id.*[17]

---

**16.** The undisputed facts establish that McCann and his staff are state employees. *See also* Wis. Stat. § 978.01(1).

**17.** *Time Warner Cable v. Doyle,* 66 F.3d 867, 875 (7th Cir.1995) states:

'If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which neces-

sarily contains the best evidence of Congress' pre-emptive intent.' *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (*quoting Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447 [1947]) However, "[p]re-emption ... is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and

Sections 2701 through 2710 were added as part of the Electronic Communications Privacy Act of 1986, Pub.L. No. 99–508, 100 Stat. 848 (1986). *See* S.Rep. No. 99–541, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 3589. As previously noted, Congress's intent in enacting the ECPA was to "protect against the unauthorized interception of electronic communications." *Ameritech Corp.*, 297 F.3d at 583 (*quoting* S.Rep. No. 99–541, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3555). In enacting the ECPA, Congress was cognizant that the information "may be subject to no constitutional privacy protection." S.Rep. No. 99–541, at 3 (1986) *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557. The statement portion of the Senate Report reads:

> Most importantly, the law must advance with the technology to ensure the continued vitality of the fourth amendment. Privacy cannot be left to depend solely on physical protection, or it will gradually erode as technology advances. Congress must act to protect the privacy of our citizens.

S.Rep. No. 99–541, at 5, *reprinted in* 1986 U.S.C.C.A.N. at 3559. The Act generally defines the scope of a party's ability to intercept personal and proprietary communications, while at the same time recognizing the government's legitimate law enforcement needs in obtaining such information. *Ameritech Corp.*, 297 F.3d at 583.[18]

McCann's preemption argument focuses on the compensation provision of § 2706(a). McCann maintains that "Congress understood the compensation requirement applied only to federal agencies." (Defendant E. Michael McCann's Brief in Support of His Motion for Summary Judgment at 25). Although framed as a preemption issue, the gist of McCann's contention is that the term "governmental entity," at least in 2706(a), means federal entities.

Section 2706(a) provides:

> Except as otherwise provided in subsection (c), a *governmental entity* obtaining the contents of communications, records, or other information under section 2702,

---

purpose." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152–53, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (*quotations and citation omitted*). The Court has indicated that preemption may occur when: Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. *Louisiana Public Service Comm'n*, 476 U.S. at 368–69, 106 S.Ct. 1890 (*citations omitted); see also de la Cuesta*, 458 U.S. at 152–53, 102 S.Ct. 3014. In sum, preemption

may arise through an express congressional statement defining the preemptive reach of a statute ("express preemption"), implicitly, when Congress manifests its intent to occupy an entire field of regulation ("field preemption"), or through conflict between state and federal law, when it either is impossible to comply with both, or when state law stands as an obstacle to the accomplishment of the full congressional objectives ("conflict preemption"). *American Agric. Movement, Inc. v. Board of Trade*, 977 F.2d 1147, 1154 (7th Cir.1992). (parallel citations omitted).

18. The ECPA is part of detailed legislative scheme under Title III of the Omnibus Crime and Control Act of 1986. *Adams v. City of Battle Creek*, 250 F.3d 980, 986 (6th Cir.2001) The legislation seeks to balance privacy rights and law enforcement needs, keeping in mind the protections of the Fourth Amendment against unreasonable search and seizure. *Id.*

2703, or 2704 of this title shall pay to the person or entity assembling or providing such information a fee for reimbursement for such costs as are reasonably necessary and which have been directly incurred in searching for, assembling, reproducing, or otherwise providing such information.

(*emphasis added*). The term "governmental entity" is repeated in subsection 2706(b) as well as throughout § 2703. "Governmental entity" is not defined in the ECPA.[19]

Further, § 2703, which establishes the standards that must be satisfied before a government entity can obtain specified information also refers to "a governmental entity." Section 2703 makes references to federal and state statutes, federal and state grand juries, and federal and state warrants, *See* 18 U.S.C. § 2703(a), § 2703(b)(1)(A), § 2703(c)(1)(A), § 2703(b)(2)(B)(i), § 2703(c)(2)(F), suggesting that a "governmental entity" may be a federal or state governmental entity. Subsection (d) outlines the requirements for a court order for disclosure for the

---

**19.** Section 2711(1) of the ECPA states that the "terms defined in section 2510 of this title have, respectively the definitions given the terms in that section." Sections 2510 through 2521 comprise the "Wire and Electronic Communications Interception and Interception of Oral Communications," commonly referred to as the Federal Wiretapping Act. The section at issue, 18 U.S.C. § 2510 *et seq.*, is also commonly referred to as Title III of the Crime Control Act.

Section 2510 of Title 18 of the United States Code does not contain a definition of "governmental entity."However, § 2510(6) defines "person" as meaning "any employee, or agent of the United States or any State or political subdivision thereof, and any individual, partnership, association, joint stock company, trust, or corporation." 18 U.S.C. § 2510(6).

Although not directly relevant to the "governmental entity" issue presented, the Court notes that in *Abbott v. Village of Winthrop Harbor*, 205 F.3d 976, 980 (7th Cir.2000), the court held "[a]s written, the statute [2510(6)] does not include a municipality within its definition of 'person.' " The court also rejected the contention that the Federal Wiretap Act's specific provision for recovery of civil damages against any "person or entity" who violates the Act is proof that Congress intended to subject municipalities to liability. *Id.* (*citing* 18 U.S.C. § 2520[a]). The court observed that as enacted in 1968, the Act authorized recovery of civil damages only against a "person" and made no mention of an "entity." *Abbott*, 205 F.3d at 980. In 1986, however, Congress amended portions of the Act, and inserted "entity" into § 2520. *Id.* Noting that the legislative history is silent

as to the reason behind the addition of the term "entity" in § 2520(a), the court of appeals stated "[i]t is unreasonable to conclude that Congress intended to subject an entire class of defendants to potential liability without any expression of that intent in the legislative commentary." *Id.* (*quoting Amati v. City of Woodstock*, 829 F.Supp. 998, 1003 [N.D.Ill. 1993]). The court indicated that it was "persuaded that municipalities are immune from suit, not only because of the corroborating testimony in the legislative history, but simply because Congress has never amended the definition of "person" in § 2510(6)." *Abbott*, 205 F.3d at 980. Thus, in *Abbott*, the court held that the federal wiretap statute, 18 U.S.C. § 2510 *et seq.*, did not apply to municipalities and therefore the village could not be held liable for the police chief's secret recording of calls made on police department telephone line.

The majority of courts addressing the issue have held that the 1986 amendments indicate that a governmental entity may be liable in a civil suit under the Federal Wiretap Act. *Adams*, 250 F.3d at 985 (citing *Organizacion JD Ltda. v. United States Dep't of Justice*, 18 F.3d 91, 94–95 [2d Cir.1994]; *Conner v. Tate*, 130 F.Supp.2d 1370, 1374–75 [N.D.Ga.2001]; *Dorris v. Absher*, 959 F.Supp. 813, 819–20 [M.D.Tenn.1997] [municipal liability exists], *aff'd in part on other grounds and rev'd in part*, 179 F.3d 420 [6th Cir.1999] [claims against county were settled prior to appeal and therefore not addressed on appeal]; *PBA Local No. 38 v. Woodbridge Police Dep't*, 832 F.Supp. 808, 822–23 [D.N.J.1993]) *See also Bodunde v. Parizek*, 1993 WL 189941, *3–4 (N.D.Ill. 1993).

contents of electronic communications in a remote computing service and/or for disclosure of records concerning electronic communication service or remote communication service and specifically states: In the case of a "State governmental authority, such a court order shall not issue if prohibited by the law of such State." 18 U.S.C. § 2703(d).[20]

█ Reference to the legislative history provides insight into this exception. With respect to telephone toll records the House Report states:

> At the state level, some states have placed limits on access to telephone toll records by state and local law enforcement. Colorado, Pennsylvania, and New Jersey have all required that a court order be obtained before access to telephone created transactional information can be granted. The majority view, however, appears to conform with federal law, that is to permit access based on any form of legal process.

H.R.Rep. No. 99–647 at 26–27 (1986) (*footnotes omitted*). This issue is further discussed in the House Report's discussion of the procedural requirements of § 2703(b) through (d) that the government must use before it can obtain access to the contents of any electronic communications held by a provider of remote communications. H.R.Rep. No. 99–647 at 68. The report states that the "parallel requirement in subsection (d) that a court order be obtained under certain standards—are intended to apply the relevant state law with respect to the legal standard such officials must meet with respect to access to those records." *Id.* The report continues:

> Thus, to the extent that a state law or State Constitution requires that a court order based on a standard other than relevance be obtained by a state govern-

ment official before such official can obtain access to the type of records protected by this chapter, *then that law would preclude the use of the provisions of this section with respect to state government officials.* Thus, state laws such as those found in Colorado, California, New Jersey and Pennsylvania would remain unaffected with respect to access by state government officials.

*Id.* (*emphasis added*). Further, the report states: "To the extent that such access is sought by a federal official under the conditions specified under this section, then state law is overriden by the Supremacy Clause." *Id.* at 69. The foregoing supports this Court's conclusion that a "governmental entity" applies to both federal and state governmental entities.

The references in § 2703 to state entities are relevant because § 2706(a) expressly applies to "a governmental entity obtaining ... records, or other information under section ... 2703...." 18 U.S.C. § 2706(a). Therefore, a "governmental entity" under § 2706(a) would have the same meaning as a "governmental entity" referenced in § 2703.

Further support for this Court's conclusion is found in the cases interpreting § 2707, also added by the ECPA. The Senate Committee Report summarized § 2707(a) as follows:

> Subsection (a) of this proposed section provides that, except as provided in section 2703(e), any provider of electronic communication service, subscriber, or customer of such service aggrieved by any violation of this new chapter may recover from any person or entity—including *governmental entities*—who knowingly or intentionally violated this chapter.

---

**20.** In a federal criminal prosecution, federal standards govern the admissibility of evidence. *See United States v. D'Antoni,* 874 F.2d 1214, 1218 (7th Cir.1989).

S.Rep. No. 99–541 at 43, *reprinted in* 1986 U.S.C.C.A.N. at 3597 (*emphasis added*). In addressing its scope, courts have construed § 2707 as authorizing a private cause of action against governmental entities that violate the ECPA and have not limited the definition of "governmental entity" to federal entities. *See Tucker v. Waddell,* 83 F.3d 688, 691 (4th Cir.1996)(A governmental entity that violates §§ 2703(a) and/or 2703(b) may be held civilly liable for such violation; however, dismissing civil claim against City of Durham, North Carolina under § 2707 because alleged violation of § 2703[c] did not give rise to private cause of action); *Organizacion JD Ltda v. U.S. Department of Justice,* 18 F.3d 91, 94 (2d Cir.1994).

Furthermore, the ECPA was "modeled after the Right to Financial Privacy Act, 12 U.S.C. 3401 *et. seq.*" *Tucker,* 83 F.3d at 692 (*quoting* S.Rep. No. 541 at 3, 1986 U.C.C.A.N. at 3557). In the Right to Financial Privacy Act, Congress used the term "government authority," as meaning "any agency or department of the United States, or any officer, employee, or agent thereof." 12 U.S.C. § 3401(3). *See also, Young v. U.S. Dept. of Justice,* 882 F.2d 633, 637 (2nd Cir.1989). If Congress intended to limit the scope of the ECPA to federal entities, it could have used the same limitation when it drafted the ECPA.

Review of passages of the House Report, cited by McCann in contending "a governmental entity" as used in the ECPA means a federal governmental entity, discloses that while the statement of the purpose of the legislation in House Report refers to federal law enforcement officers, Senate Report refers to law enforcement authorities and needs, without limitation to federal entities. *Compare* H.R.Rep. No. 99–647, at 16 *and* S.Rep. No. 99–541, at 3, *reprinted in* 1986 U.S.C.C.A.N. 3555, 3557.

Also, the statistics in the House Report regarding telephone surveillance and wiretapping, use or intended use of radio scanners, cellular telephone interception, tracking devices, pen registers and electronic mail interception are taken from an Administrative Office of the United States Courts, *Report on Application for Orders Authorizing of Approving the Interception of Wire or Oral Communications for the Period January 1, 1984 to December 31, 1984,* and Office of Technology Assessment Report, United States Congress, *Electronic Surveillance and Civil Liberties,* (1985). (Defendant E. Michael McCann's Brief in Support of His Motion for Summary Judgment at 23 *[citing* H.R.Rep. No. 99–647, at 18] ). Given the sources of these materials, their provision of federal statistics is no surprise. Further, the Congressional Budget Office Estimate of "no significant cost to the federal government and no cost to state or local governments" with respect to the *entire* ECPA, is not sufficient basis for concluding that Congress intended that the compensation provision of § 2706 *not* apply to a state governmental entity. (Defendant E. Michael McCann's Brief in Support of His Motion for Summary Judgment at 23–24 *[citing* H.R.Rep. No. 99–647, at 79] ). Buttressing this conclusion is the report's statement that "the government has not traditionally paid for such information" and the procedure provided for resolution of any reimbursement disputes. *See* H.R.Rep. No. 99–647, at 73–74 (discussing § 2706). For the foregoing reasons, this Court is not persuaded that Congress intended that the compensation requirement only apply to federal agencies.

### Applicability of ECPA

As the Seventh Circuit Court of Appeals stated "Ameritech's suit seeks no reimbursement for McCann's previous noncompliance but a declaration that he must comply with Section 2706 in the future." *See Ameritech Corp.,* 297 F.3d at 588. Given the Court's analysis, it concludes

that McCann is subject to the dictates of the ECPA. Government entities, such as McCann, must pay service providers "a fee for reimbursement for such costs as are reasonably necessary and which have been directly incurred in searching for, assembling, reproducing, or otherwise providing such information" requested pursuant to § 2703, *inter alia.* § 2706(a).[21] Subsection (b) provides that fees required under subsection (a) shall be agreed upon by the provider and governmental entity. Where no agreement has been reached, the statute envisions resolution "by *the court which issued the order for production of such information (or the court before which a criminal prosecutor relating to such information would be brought, if no order was issued for production of the information* )." 18 U.S.C. § 2706(b) *(emphasis added).*

Because of this, whether McCann is required to pay for an AMA request, is an issue that is not squarely before this Court and would render any opinion thereon purely advisory. In enacting § 2706, Congress clearly intended that a governmental entity which requests, pursuant to § 2703, telephone toll records and listing information generally need not pay the provider for the necessary costs involved in their production. Congress excluded this category of information from the general rule of reimbursement "because for the most part the government has not traditionally paid for such information." H.R.Rep. No. 99–647, at 73; *accord* S.Rep. No. 99–541 at 43, *reprinted in* 1986 U.S.C.C.A.N. at 3597. ("No fee is normally required for access to such records.") In discussing a

draft of § 2706 which was subsequently enacted, the House Report noted that Congress:

expects that the Department of Justice will by regulation (subject to notice and comment) promulgate written criteria to guide the parties and the courts with respect to the meaning of the terms 'voluminous' and 'undue burden.' The committee hopes that the uniform application of regulations will reduce the need to rely on judicial intervention to resolve reimbursement disputes. The most important factor to examine is the nature of and past practices in the area. To the extent that the request exceeds the nature and scope of information usually sought without compensation, then the reimbursement provisions would come into play.

H.R.Rep. No. 99–647 at 74. The legislative history evinces Congress' desire to strike a balance which would permit service providers some reimbursement for information which had traditionally been provided without cost. *See Michigan Bell Telephone Co. v. Drug Enforcement Admin.,* 693 F.Supp. 542, 544 –545 (E.D.Mich.1988). Further, it is apparent that Congress recognized that this judgment would have to be rendered in light of the aggregate costs of compliance. *Id.* Comprehensive regulations defining the responsibilities of law enforcement agencies and service providers were expected to minimize this sort of dispute. The Department of Justice has apparently failed to promulgate regulations under § 2706, however, and therefore additional burdens

---

**21.** An exception to this general rule is provided in subsection (c) for toll records and subscriber information: "[t]he requirement of subsection (a) of this section does not apply with respect to records or other information maintained by a communications common carrier ... relate[d] to telephone toll records and telephone listings obtained under section 2703 of this title." 18 U.S.C. § 2706(c). Subsection (c) further provides that a court, however, may also order payment as described in subsection (a) if the court finds that "the information required is unusually voluminous in nature or otherwise caused a burden on the provider." *Id.*

have been placed upon the courts to define the parties' responsibilities thereunder.

The court whose duty it is to resolve any dispute is *the court which issued the order for production of such information (or the court before which a criminal prosecution relating to such information would be brought, if no order was issued for production of the information).* *See* 18 U.S.C. § 2706(b). Because this Court is not the court authorized by the statute to resolve this issue; because this Court has neither issued any order for production of such information nor is it the court before whom a criminal prosecution relating to such information would be brought if no order was issued for the production of such information; and, because the relief sought is a declaration of future compliance rendering any decision on the nature of the services provided by Ameritech purely advisory, resolution of this issue is reserved for the state court that, under § 2706, is empowered to render such a decision.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT**

McCann's motion for summary judgment (Docket # 74) is **DENIED**.

Ameritech's motion for summary judgment (Docket # 83) is **GRANTED** to the extent stated herein.

This action is **DISMISSED**.

The Clerk of Court **SHALL ENTER JUDGMENT** accordingly.